In re NORTH COUNTY PLACE,
LTD., Debtor.

In re Marc H. SIEGAL, Debtor.

In re GRANADA CALABASAS
LTD., Debtor.

In re CALABASAS BUSINESS PARK,
PHASE I LTD., Debtor.

In re PARKWAY CALABASAS
LTD., Debtor.

In re AMERICAN SAVINGS AND
LOAN ASSOCIATION, Movant,

v.

David A. GILL, Chapter 11
Trustee, Respondent.

Bankruptcy Nos. LA 84–09004 SB, LA
84–07435 SB, LA 84–07436 SB, LA
84–09002 SB and LA 84–09003 SB.
Ref. No. M6–07125 SB.

United States Bankruptcy Court,
C.D. California.

Oct. 17, 1988.

438

David M. Stern, Stern & Miller, Santa Monica, Cal., for American Sav. and Loan.

David R. Weinstein, David A. Gill, Danning, Gill, Gould, Diamond & Spector, Los Angeles, Cal., for trustee.

Arnold Kupetz, Sulmeyer, Kupetz, Baumann & Rothman, Los Angeles, Cal., for Marc Siegal.

McCutchen, Black, Verleger & Shea, Buchalter, Nemer, Fields & Younger, Los Angeles, Cal., for special real estate listing counsel for trustee.

Wyman, Bautzer, Kuchel & Silbert, Los Angeles, Cal., for creditors committee.

## AMENDED OPINION AWARDING SURCHARGE ON COLLATERAL OF SECURED CREDITOR

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. Introduction

This contested matter raises the question of whether the Chapter 11 trustee in a failed reorganization case may surcharge the collateral of the secured creditor American Savings & Loan Association ("American") for expenses incurred in the completion of the shopping center and office building belonging to the debtor North County Place, Ltd. ("North County") and the leasing of the commercial space, where the price bid at the subsequent foreclosure sale did not exceed the encumbrance on the property.

The Court finds that the trustee has quantified the benefit to American resulting from the leasing of the property, but has not provided sufficient detail to quantify the value of the completion of construction. The direct construction costs were paid for with post-petition funds from American, and thus are not at issue in this contested matter. The Court finds that the leasing of the property to tenants contrib-

uted $813,000 in value to the property, which is more than sufficient to cover the leasing costs and the indirect construction costs sought by the trustee. The Court holds that the trustee is entitled to surcharge a portion of these costs and expenses in the amount of $409,413 against American's interest in the collateral.

### II. Facts

This contested matter involves one of a number of real estate developments by Marc H. Siegal and his brother Mitchell Siegal. The Siegal brothers are direct or indirect owners of a number of real estate developments, four of which are debtors before this Court. Marc Siegal is also a debtor in a case before this Court. An involuntary bankruptcy case against Mitchell Siegal has been dismissed.

The North County bankruptcy case was filed as an involuntary Chapter 7 case on May 1, 1984. It was converted to a Chapter 11 case and David Gill was appointed as trustee on May 14, 1984. The five pending cases were substantively consolidated by order entered on February 27, 1987.

In approximately 1981 the Siegal brothers caused the formation of North County, a limited partnership in which they, or entities that they directly or indirectly own, are the only limited partners and the only general partners. Its purpose was to develop a shopping center and office building on property located in Oceanside, California.

In early 1983 North County obtained a commitment for $8,175,000 in construction financing from American, secured by a deed of trust on the property. The interest rate on the construction loan floated at two percent above the prime lending rate. However, the note also provided that at no time was the interest rate to fall below eleven percent. As of the date of filing of the bankruptcy case, approximately $6,000,000 had been drawn against the construction financing, and the trustee estimates that the buildings were 70% to 80% complete.[1]

---

1. Marc Siegal, one of North County's owners, has filed a declaration supporting this estimate.

After the filing of the bankruptcy case, North County and American agreed that American was oversecured, and that the construction should be completed. American advanced approximately $2,000,000 in post-petition financing, approved by the Court, to complete the construction of the buildings, which brought the total of American's advances to approximately $8,000,-000. Because no revenue was generated by the property during construction, the trustee made few payments, and interest continued to accrue on the loan. Ultimately, the total indebtedness reached $10,100,-000. In addition, unpaid property taxes (including pre-petition taxes) accrued in the amount of $149,680.56.

After completing construction of the buildings, the trustee attempted to lease the premises. The trustee had considerable difficulty in leasing the premises for several reasons. First, in an effort to avoid unnecessary expenses, the trustee permitted the exterior of the buildings and the surrounding premises to become run down. Second, while at the outset the debtor's office building was the only one in the neighborhood, financially stronger developers subsequently built other office buildings nearby with more attractive appearances than North County's buildings. The trustee had to expend a substantial sum in obtaining tenants. At the time of foreclosure approximately 65% of the premises had been leased.

The trustee attempted to market the property, with no success. The property declined in value after the filing of the bankruptcy case in consequence of increased competition for commercial property in the neighborhood and changes in federal tax laws.

American first filed its motion for relief from stay and sequestration of rents on October 16, 1986. The trustee opposed the motion, and filed a cross-motion for surcharge of collateral. The Court granted relief from stay and sequestration of rents on December 5, 1986, and continued the hearing on surcharge of collateral. American foreclosed in May, 1987 and purchased the property for $7,800,815.77 at the foreclosure sale.

The trustee[2] seeks now to surcharge American for the costs and expenses of completion of the buildings and of leasing them. For these services the trustee seeks to recover the following expenses:

| | |
|---|---|
| Trustee's fee | $ 36,003.19 |
| Trustee's general counsel | 100,021.35 |
| Trustee's special leasing counsel | 223,707.20 |
| Accountants | 21,822.91 |
| Trustee's special real estate counsel | 113,039.29 |
| Creditor's committee counsel | 540.00 |
| Mitchell Siegal's counsel | 6,817.33 |
| Management services-Marc Siegal | 141,795.00 |
| Marc Siegal's counsel | 33,458.59 |
| Costs | 1,570.41 |
| Total | $678,775.27 |

While the fees that the trustee seeks to surcharge against the collateral in this case are substantial, they are only a small portion of the administrative expenses of these consolidated cases.

General counsel for the trustee is his own law firm Danning, Guild, Gould, Diamond & Spector. The trustee's special leasing counsel is McCutchen, Black, Verleger & Shea. The trustee's accountants are Kaplan & Swicker. The trustee's manager is the debtor Marc Siegal, who is one of the principal owners of the debtor. Marc Siegal's counsel is Sulmeyer, Kupetz, Bauman & Rothman. Mitchell Siegal's counsel is Pachulski, Stang & Ziehl. The trustee's special real estate counsel is Buchalter, Nemer, Fields & Younger. The creditor's committee's counsel is Wyman, Bautzer, Kuchel & Silbert.

American contends that the trustee has no right to surcharge its collateral. If the trustee prevails on the right to surcharge,

2. Formally, it is the trustee who seeks the surcharge as to all of the fees at issue in this proceeding. In fact, the claims belong to all of the administrative claimants for this estate prior to the substantive consolidation of this case with four related cases. While the standing of the administrative claimants apart from the trustee to make a claim for surcharge may be questioned, American has declined to raise this issue.

American agrees that most of the trustee's general counsel's fees, a substantial portion of the accountant's fees, and part of leasing counsel's fees are surchargeable. American challenges the surchargeability of the remainder of the fees, even if the trustee is entitled to an appropriate surcharge.

The Court has ruled in a prior hearing on this motion that the trustee has not waived his right to ask for a surcharge against American's collateral.

### III. Analysis

The estate created by the filing of a bankruptcy case includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Bankruptcy Code § 541(a)(1), 11 U.S.C. § 541(a)(1) (1979). The bankruptcy estate's assets are subject to all liens and encumbrances existing when the petition is filed. *Central Bank v. Cascade Hydraulics & Utility Service, Inc. (In re Cascade Hydraulics & Utility Service, Inc.)*, 815 F.2d 546, 548 (9th Cir.1987). These security interests must be respected by the trustee, except to the extent that they may be avoided under the Bankruptcy Code.

Administrative expenses and the general costs of reorganization may not generally be charged against secured collateral. *Cascade Hydraulics, supra*, 815 F.2d at 548; *General Electric Credit Corporation v. Levin & Weintraub (In re Flagstaff Foodservice Corp.)*, 739 F.2d 73, 76 (2d Cir.1984). Administrative expenses may normally be charged only against unsecured assets of the estate. Section 506(c) is not intended as a substitute for the normal recovery of administrative expenses from the debtor's estate. *Brookfield PCA v. Borron*, 738 F.2d 951, 953 (8th Cir.1984); *In re Trim–X, Inc.* 695 F.2d 296, 301 (7th

Cir.1983). A surcharge is also not permitted for general expenses of an unsuccessful reorganization effort. *In re Combined Crofts Corp.*, 54 B.R. 294, 297–98 (Bankr. W.D.Wis.1985). The trustee has the burden of proving that his costs and expenses may be surcharged against a creditor's collateral. *See, e.g., Flagstaff, supra*, at 77.

In this case the trustee claims that he qualifies for an exception to the foregoing rules.

### A. Statute

An exception permitting the surcharge of collateral has long been recognized under the theory of unjust enrichment, where the trustee contributes value to the collateral. This exception is codified in Bankruptcy Code § 506(c), 11 U.S.C. § 506(c) (1979):

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Congress' express intent in enacting section 506(c) was to assure that, any time a debtor in possession "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral, the ... debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party." 124 Cong.Rec. 32398 (cum. ed. Sept. 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Admin. News 6451.

■ The trustee also argues that Bankruptcy Code § 552(b)[3] permits the Court to award a surcharge based on the equities of the case. This argument is misplaced.

---

**3.** Section 552(b) provides:

Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property,

then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, *except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.* 11 U.S.C. § 552(b) (Supp.1988) (emphasis added).

Section 552(b) gives the Court equitable power to limit the application of a pre-petition security interest to post-petition "proceeds, product, offspring, rents, or profits". But where as here the security at issue is the original security, section 552(b) does not give the Court any power to impose expenses on the secured creditor. Any such power must derive from section 506(c).

### B. *Case Law*

There are three lines of authority interpreting section 506(c). The hard line, adopted by the Second and Eighth Circuits, requires the debtor to show, as a condition for imposing a surcharge on collateral, that the funds at issue were expended primarily for the benefit of the creditor, and that the creditor directly benefited from the expenditure. *General Electric Credit Corp. v. Peltz (In re Flagstaff Foodservice Corp.),* 762 F.2d 10, 12 (2d Cir.1985); *Brookfield PCA v. Borron,* 738 F.2d 951, 952 (8th Cir.1984).

A second line of authority, adopted by the Third Circuit, takes a softer line, and permits the surcharge of collateral for general administrative expenses, where the expenses permit the debtor to preserve the going concern value of the estate. *Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Corp.),* 799 F.2d 91, 94–95 (3d Cir.1986).

The Ninth Circuit has adopted a third view, which is a modified version of the hard line. The governing Ninth Circuit case is *Central Bank v. Cascade Hydraulics & Utility Service (In re Cascade Hydraulics & Utility Service),* 815 F.2d 546 (9th Cir.1987), where the court held that, to qualify for a surcharge against a creditor's collateral, the trustee must demonstrate that the expenses were (1) reasonable, (2) necessary, and (3) beneficial to the secured creditor. *Id.,* at 548; *accord, Bank of Honolulu v. Anderson (In re Anderson),* 66 B.R. 97, 100 (9th Cir. BAP 1986); *Sells*

*v. Sonoma V (In re Sonoma V),* 24 B.R. 600, 603 (9th Cir. BAP 1982). The Seventh Circuit has also adopted this modified hard line. *See In re Trim–X, Inc.,* 695 F.2d 296, 299–302 (7th Cir.1982). Unlike the Second and Eighth Circuits, the Seventh and Ninth circuits do not require a finding that the expenditures were "primarily" for the benefit of the secured creditor.[4]

■ A surcharge is also appropriate where the secured creditor has caused or consented to the expense. *Cascade Hydraulics,* 815 F.2d at 548; *In re Trim–X, Inc.,* 695 F.2d 296, 301 (7th Cir.1982); *First Western Savings & Loan Association v. Anderson,* 252 F.2d 544, 547 (9th Cir.1958). In this case American did agree with the trustee to complete the construction of the building, and to advance some $2,000,000 toward this construction. However, this agreement does not fall within the scope of this exception. Mere cooperation with the debtor does not make a secured creditor liable for expenses of administration. *Cascade Hydraulics, supra,* at 548; *Flagstaff I,* 739 F.2d at 77. Unless American specifically consented to the priority treatment of these expenses, it did not give the consent required for this exception. *In re Sherrill,* 78 B.R. 804, 809 (Bankr.W.D.Tex.1987). The parties agree that American has not agreed to the trustee's priming of its security interest.

Section 506(c) permits a surcharge against collateral even where the value of the collateral has declined through use or market fluctuations. 4 *Collier on Bankruptcy* ¶ 552.02 (15th ed. 1988), at 552–9.

Chapter 11 is not designed to permit a debtor or the trustee to gamble a secured creditor's money on a successful reorganization. Any such gamble should be made only with funds belonging to unsecured creditors and the shareholders, and normally only with their consent.

American has raised the issue of what should be the nature of a surcharge award-

---

**4.** There is dictum in *Cascade Hydraulics* that the payment of administrative expenses from the proceeds of secured collateral must be (1) incurred primarily for the benefit of the secured creditor, or (2) caused by the secured creditor or consented to by it. *See* 815 F.2d at 548. However, the "primarily" language played no role in the court's decision, and has not been adopted in any other Ninth Circuit Court opinion.

ed by the Court—a judgment for cash against American, or a lien against the property. The parties have stipulated that the surcharge should be treated as a lien against the property.

### C. *Benefit to American*

There must be a benefit to the secured creditor before the trustee is entitled to a surcharge under section 506(c). If the trustee has spent money, but has not conferred any benefit on the creditor, no surcharge is permitted. *In re AFCO Enterprises*, 35 B.R. 512, 515 (Bankr.D.Utah 1983).

The benefit test establishes a ceiling on the recovery of the trustee: The trustee may recover only to the extent of the benefit conferred on American. The actual surcharge is further limited to those expenses that were reasonable and necessary to obtain this benefit.

It is noteworthy that section 506(c) does not usually permit the trustee to recover the entire benefit conferred on the secured creditor. It only permits the trustee to recover his or her reasonable and necessary costs and expenses. While the benefit imposes a ceiling on the trustee's recovery, it does not impose a floor: To the extent that the secured creditor is permitted to keep part of the benefit, this is a windfall to the creditor. In this case, for example, the benefit is shared approximately equally by the trustee and the secured creditor, and American has received a windfall worth approximately $400,000.

### 1. *Preserving and Disposing of Collateral—Statutory Language*

To satisfy the benefit test, the debtor must establish in quantifiable terms that it expended funds directly to protect and to preserve the collateral. *Cascade Hydraulics, supra*, 815 F.2d at 548; *Brookfield PCA v. Borron*, 738 F.2d 951, 952 (8th Cir.1984); *Sells v. Sonoma V (In re Sonoma V)*, 24 B.R. 600, 603–05 (9th Cir. BAP 1982). American argues that the expenditures by the trustee in this case were neither to protect nor to preserve the property here at issue. Instead, American argues, the expenditures were to improve the prop-

erty, and thus fall outside the scope of section 506(c).

Some care is required in interpreting the statutory language permitting the trustee to surcharge the costs and expenses of "preserving, or disposing of, such property". Some costs of preserving collateral are not surchargeable. For example, a trustee may not store property for a year at substantial cost to the estate, and then surcharge the collateral for the storage costs. *In re Beker Industries Corp.*, 89 B.R. 336, 341–42 (S.D.N.Y.1988).

The Court does not believe that section 506(c) should be read as narrowly as American urges. Courts have long recognized, for example, that upon the harvesting of crops a debtor may surcharge the collateral for costs of maintaining, harvesting, and marketing the crops. *See e.g., In re Hardage*, 69 B.R. 681, 685 (Bankr.N.D.Tex.1987), *rev'd on other grounds*, 837 F.2d 1319 (5th Cir.1988); *Randall v. Bank of Viola (In re Randall)*, 58 B.R. 289, 290–91 (Bankr.C.D. Ill.1986); *First National Bank v. Hamilton (In re Hamilton)*, 18 B.R. 868, 872–73 (Bankr.D.Colo.1982). Similarly, courts have long recognized that the expenses of sale of collateral and of preparation for sale are recoverable by a trustee. *See, e.g., Marino v. Xuereb (In re Marino)*, 794 F.2d 1367, 1370 (9th Cir.1986); *C.I.T. Corporation v. A & A Printing, Inc.*, 70 B.R. 878, 880 (M.D.N.C.1987).

Where the improvement of property confers a direct quantifiable benefit on a secured creditor, the Court holds that the trustee may recover the costs and expenses of the improvement, subject to the ceiling of the value conferred.

A secured creditor may limit its exposure to surcharge under section 506(c) by requesting that the services in question not be performed. *In re Cann & Saul Steel Co.*, 86 B.R. 413, 418 (Bankr.E.D.Pa.1988). A reasonable and specific request of this kind would bar a surcharge for such expenses. *Id.* In this case American has offered no evidence that it requested that any of the services here at issue not be performed.

## 2. *Amount of Benefit Conferred*

*Cascade Hydraulics* requires the trustee to demonstrate the amount of the benefit conferred on American in quantifiable terms. The trustee contends that he has conferred a benefit of at least $1,000,000 on American through the leasing of the property.

The Court finds that two courses of action by the trustee conferred separate benefits on American. If the trustee had abandoned the property at the outset, American (or its successor) would have been required to undertake the same courses of action with respect to the property.

■ First, the trustee completed the construction of the building on the property. The leasing of the property and generation of income to repay the expenses of construction could not be effected until the construction was completed. This completion of construction was necessary to protect and preserve the collateral, and provided a direct benefit to American.

The evidence is incomplete for the quantification of this benefit. There is some evidence that the property was worth perhaps $6,000,000 at the time that the bankruptcy case was filed, and it was worth approximately $10,000,000 at the time of foreclosure. The explanation of the difference in value, however, is incomplete. American lent approximately $2,000,000 for additional construction costs. At the same time, the property has depreciated in value because of changes in the market and changes in the federal tax laws. The Court has insufficient evidence to quantify this benefit resulting from the completion of construction. Absent quantification, the ceiling on the surcharge cannot include this benefit.

■ The second benefit conferred by the trustee was the leasing of the property after its construction. On this subject there is specific evidence before the Court. If the trustee had not undertaken the leasing of the premises, American (or its successor) would have been required to lease the premises before income could be generated to service the debt and to realize the value of the property. The leasing of property directly protected and preserved the property, and provided a specific benefit to American.

■ In support of the valuation of this contribution, the trustee has offered a declaration by James W. Battle, Jr.,[5] a commercial real estate broker. The leasing of the building contributed $1,000,000 to $1,500,000 in value to the property, in Battle's opinion, because a building that is generating revenue is worth substantially more than an empty office or commercial building.[6] The trustee also has offered deposition testimony of James Naughton, Jr., American's real estate expert, in which Naughton concludes that the leasing contributed $813,000 to the value of the property.[7] American offers no specific evi-

---

**5.** American objected to the material portions of the Battle declaration, and moved to strike them, on the grounds that they were based on April, 1986 market data, which were a year old at the time that the Court considered this evidence, and that no expert would rely on such outdated evidence. The Court denied the motion to strike, on the grounds that the objection went to the weight of the evidence, rather than its admissibility. The Court notes that American has not offered its own quantification of the benefit resulting from the leasing of the facility.

**6.** American challenges the trustee's position that the property was not marketable in its partially completed condition, and claims that the trustee in fact received an offer to purchase the property at a price greater than the encumbrances. The trustee disputes this claim, and contends that the communication that he received was less than a bona fide offer. The evidence provided to the Court indicates that the trustee did in fact receive an offer for the property in August, 1984, and that negotiations continued to the end of the year. The information is inconclusive as to whether a sale could have been closed, and no reason is provided for the termination of negotiations. The Court finds that the evidence is insufficient to base a disqualification for a surcharge on these grounds.

**7.** Although Naughton is American's valuation expert, Naughton's deposition testimony offered by the trustee is challenged by American, on the grounds that it was based on assumptions that were not true. After reviewing the deposition testimony, the Court does not find that it is conclusive. However, the Court does find it probative, particularly in view of the fact that

dence of its own on the value of the leasing of the buildings.

 The Court finds that the leasing of the buildings contributed at least $813,000 to their value. Thus there is at least $813,000 in value derived from the efforts of the trustee that is quantifiable, that was beneficial to American, and that directly protected and preserved the collateral. This ceiling is clearly high enough to permit the surcharge sought by the trustee.

### 3. Loss of Equity Cushion

 American challenges the measure of benefit calculated by the trustee. American contends that it has received no benefit, because it was oversecured at the time that the case was filed, but that it was either undersecured or barely fully secured at the time of foreclosure. Thus, American argues, it received no benefit whatever from the leasing operations.

Between the date of filing and the date of foreclosure, almost exactly three years, the secured debt increased from approximately $6,000,000 to $10,000,000. Approximately half of the increase is accounted for by the construction paid for with post-petition cash advances by American. Apparently the remaining $2,100,000 is accounted for by interest charges. The parties agree that American was over-secured at the time of filing, and for the sake of discussion the Court assumes that the property was worth approximately $7,000,000 at the time of filing.

Interest does not contribute to the value of collateral. Interest alone on American's encumbrance would have raised the debt on the property to approximately $8,000,000 at the time of foreclosure, if American had advanced no further funds. If the trustee had done nothing to the property except maintain it, its value would have remained at approximately $7,000,000, except insofar as it changed as a result of market conditions.

If the interest rate on American's note had been twice as high, the debt at the time of foreclosure would have been approximately $12,000,000, and American would have been undersecured by almost $2,000,000. If its interest rate had been half as high, in contrast, there would have been approximately $1,000,000 in equity, and relief from stay might have been denied. None of these alternatives would have any relation to the market value of the collateral, or to the benefit conferred by the trustee on the property.

The statement that the interest rate is totally unrelated to the market value of the collateral or to the value conferred by the trustee may slightly overstate the case. There may on occasion be a connection between (1) the interest rate available in the market place and agreed to by the debtor, and (2) the increase in market value resulting from construction and leasing of the facility. Such a connection would require at least the following conditions, all of which may be inapplicable in this case: (1) the initial interest rate was a market interest rate, (2) the construction and leasing was completed in a reasonable period of time; (3) there were no other significant impacts on market value. Furthermore, the eleven percent floor on the interest rate alone disassociated it from the market value of the collateral and the benefit conferred by the trustee: but for this floor, the interest rate would have been substantially lower.

### 4. Payment by American

 American argues in addition that, because these expenses have been paid for with American's funds, it would be unjust to surcharge the collateral for these expenses. In American's view, such a surcharge would in effect require American to pay twice for the same expenses.

This argument is without merit. American has not paid for the completion of the buildings any more than it has paid for the pre-filing construction. In both cases it lent money to North County, and North County was liable for repayment. It did not pay for any of the construction in any relevant sense. If it had, it would own the

Naughton's numbers are quite similar to those in Battle's declaration.

buildings, at least in part, and North County would not have owed the entire construction loan (plus interest) to it at the time of foreclosure.

American's real complaint is that it did not expect to pay these expenses at all at the time that it agreed to finance the construction, and now the Court is requiring it to pay some of them. This merely raises the issue of section 506(c), which is the subject of this entire proceeding.

### D. *Necessity*

Having established and quantified the benefit to American of the completion and leasing of the buildings, the Court must examine the costs and expenses claimed, to determine to what extent they were necessary and reasonable for creating the benefit.

### 1. *Construction and Leasing*

■ In this case the trustee received property that was unmarketable in consequence of its partially completed construction. The trustee concluded that the property was not marketable until construction was completed and the property was leased and generating income. In consequence, the trustee was required either to complete the construction and to lease the property, or to abandon it to the secured creditor. Because the parties agreed that the property was worth more than the indebtedness, the trustee would have breached his duties to the unsecured creditors if he had abandoned the property to American. Thus the completion of the construction and the leasing of the property was necessary to its ultimate sale, and to its administration by the trustee.

The Court finds that American also could not have realized any value from this property without completing the construction and leasing of the buildings.

### 2. *Surchargeable Services*

Given the necessity of the completion of construction and the renting of the buildings, the Court must also examine the necessity of the services performed by each of the parties for whom the trustee seeks a surcharge.

■ Marc Siegal provided management of the construction and leasing. This function was necessary to the completion and the leasing of the buildings.

■ The McCutchen firm, the trustee's special counsel, performed the principal work in finding tenants to occupy the buildings. After finding the prospective tenants, it conducted the lease negotiations with them and the documentation of the leases.

American argues that a substantial portion of McCutchen's time was spent in negotiations with prospective lessees that did not result in leases, and that this time should be excluded. The Court does not find this objection persuasive. If a lessor has to negotiate with 25 prospective tenants to obtain 10 leases, all of these negotiations are necessary. If only 25 are necessary to produce 10 leases but the landlord negotiates with 100, some of the negotiations may be unnecessary. American has not charged any such inefficiency against McCutchen. In addition, many tenants requested attornment and nondisturbance agreements with American, in case of foreclosure, which McCutchen also negotiated. These services were necessary to the leasing of the buildings.

■ The Danning firm, counsel for the trustee, performed substantial services in the coordination with Nielson Construction Co., the general contractor, and the subcontractors during the completion of the buildings. In addition, the Danning firm carried out the arbitration of a substantial dispute with Nielson, which threatened to prevent the completion of the construction. The firm also provided counsel on the bankruptcy aspects of the leasing of the facilities. These services were necessary to the completion of construction of the buildings.

■ American does not dispute the necessity of the $12,198.85 in fees for Kaplan & Swicker, the accounting firm hired by the debtor with Court approval, for the services that the Court finds benefited American. These services include preparing payroll tax returns, and reviewing and

organizing files relating to contractor costs, rental commissions, rental receipts, and operating expenses.

■ The Buchalter firm, the trustee's special real estate counsel, performed services in connection with the attempted sale of the property including title, lien, and easement work. Because there was no sale, and American acquired the property through foreclosure after obtaining relief from stay, these services provided no benefit to American. In consequence, the Buchalter fees are not surchargeable against American.

■ Neither the committee of creditors nor its counsel was necessary for the completion of the construction or the leasing of the buildings. Services of counsel for the committee related entirely to the unsuccessful reorganization of North County.

■ The trustee seeks to surcharge the statutory maximum for his fees against American. However, he has not provided sufficient information to the Court on what services he performed that were necessary to the completion of the construction and the leasing of the premises, apart from the services of his various counsel. Because the Court is authorizing the surcharge of counsel fees for both the trustee's general counsel and his leasing counsel, and management fees for Marc Siegal, the Court declines to surcharge separate trustee's fees against the property.

■ Counsel for Mitchell Siegal filed involuntary cases for three of the debtors whose cases are consolidated herein, and performed certain other services at the outset of the case. However, it does not appear that these services contributed to the benefit to American in any substantial respect. In consequence, these counsel fees are not surchargeable.

■ Counsel for Marc Siegal performed a number of services at the outset of the cases that may have contributed to the benefit to American. However, these services appear to duplicate to a large extent those charged by counsel for the trustee. Thus no separate surcharge in allowed for these expenses.

## E. *Reasonableness*

■ American also challenges the charges that the trustee wants to make on the grounds that they are not reasonable. American argues that, even if the trustee and counsel services were necessary for the completion of construction and the leasing of the buildings, the services could have been provided at lower expense, and American should not be charged the full fees awarded to the trustee and counsel. The trustee argues, in response, that the previous Court award of these fees makes a prima facie case of their reasonableness, which American has not rebutted. The trustee argues that all reasonable expenses that were necessary to the completion of construction and the leasing of the property should be surcharged, up to the ceiling of the value conferred on American.

The Court finds the trustee's position largely persuasive. The Court holds that reasonable expenses incurred by the trustee for the completion and the leasing of the property, within the context of this particular bankruptcy case, are surchargeable against American's interest in the property. Under Ninth Circuit case law, the trustee is not limited to recovering expenses at the level that American would have incurred if American had undertaken the services performed by the trustee. *Bank of Honolulu v. Anderson (In re Anderson),* 66 B.R. 97, 99–100 (9th Cir. BAP 1986). The ceiling on these charges is $813,000, the value added to the collateral by these improvements. It does not matter that American could obtain the same services for a lower price, except insofar as this bears on the reasonableness of the trustee's charges. Section 506(c) does not limit the trustee to the least expensive services available, or limit the surcharge to the fees that would have been incurred absent a bankruptcy case.

The Court assumes without deciding that, absent a bankruptcy case, the construction of the buildings and their leasing could have been completed less expensively than in this case. This, however, is also not the focus of section 506(c). Section

506(c) requires that the reasonableness determination be made within the context of the bankruptcy case, not outside it. The Court has received substantial evidence, all undisputed, on the legal obstacles that had to be surmounted in order to complete the construction and to lease the property, and the substantial costs resulting therefrom.

The Court has not imposed the trustee's position on American altogether. While services of the trustee and of Marc Siegal's counsel appear to have contributed somewhat to American's benefit, the Court declines to surcharged these costs and expenses against the collateral, on the grounds that they overlap other costs and expenses for which a surcharge is awarded.

After the Court required the deletion of costs and expenses relating to the unsuccessful effort to sell the property, American stipulated with the trustee as to the value of the services of the trustee's general counsel to the property, in the amount of $71,936.54. After the Court found that services of the trustee's accountant were general administrative expenses except for a possible $12,198.85 on Schedule A of the accountants' fee application, American has stipulated to the surchargeability of this amount. These stipulations were offered, and accepted by the Court, only to settle the amount of the surcharge on the assumption of its propriety: American has reserved the issue of the propriety of the surcharge in general.

■ The fees sought by the McCutchen firm are very substantial for the leasing of these buildings. However, the evidence indicates that the owner's bankruptcy made it much more expensive to negotiate leases with the commercial tenants. Changes in the basic form leases required the approval of the trustee, his counsel, and American. McCutchen spent a significant amount of time reassuring existing and prospective tenants of the viability of the center. During the delay caused by the bankruptcy, competing structures were developed, creating more competition and requiring more

negotiation and modification of lease forms. The Court finds that McCutchen's fee charged to the estate of $223,707.20 is a reasonable charge under the facts of this case, and this entire amount is surcharged against American's collateral.

■ The trustee seeks to surcharge $108,600 for management fees on behalf of Marc Siegal. After reviewing Siegal's time and expense reports, the Court finds that Siegal did not work efficiently. The Court notes, however, that his employment order limited his compensation to $6,000 per month, and that his time charges at $35 per hour substantially exceeded this amount. The Court also finds that approximately a quarter of his time was spent on matters that do not qualify for surcharge. Furthermore, the fees and expenses for his services have already been reduced substantially, from approximately $190,000 to $144,000, by stipulation of the parties. After weighing these factors, the Court finds that $100,000 of Siegal's fees should be surcharged against American's collateral.

Because the Court finds that the fees for the counsel for the creditors committee, counsel for Mitchell Siegal and for Marc Siegal, and the trustee's special real estate counsel did not confer a sufficient benefit on American, it does not reach the issue of their reasonableness.

### IV. *Conclusion*

In conclusion, the Court finds that under Bankruptcy Code § 506(c) the trustee may impose a surcharge against the property at issue in this case for the following expenses:[8]

| | |
|---|---|
| Trustee's counsel | $ 71,936.54 |
| Trustee's special counsel | 223,707.20 |
| Accountants | 12,198.85 |
| Marc Siegal | 100,000.00 |
| Costs | 1,570.41 |
| Total | $409,413.00 |

The foregoing constitutes the Court's findings of fact and conclusions of law.

---

8. In making the determination of what costs and expenses the trustee may surcharge against American, the Court intimates no conclusion as to the allowability of these fees outside of the context of the motion to surcharge.

The Trustee is directed to submit a judgment for this amount.