**In re DEBBIE REYNOLDS HOTEL & CASINO, INC., Debtor.**

**Debbie Reynolds Management Company, Inc., Debtor.**

**Debbie Reynolds Resorts, Inc., Debtor.**

**Calstar Corporation, Appellant,**

**v.**

**Debbie Reynolds Hotel & Casino, Inc.; Debbie Reynolds Management Company, Inc.; and Debbie Reynolds Resorts, Inc., Appellees.**

**BAP No. NV–98–1862–RyKBu.**

**Bankruptcy Nos. 97–25089–RCJ, 97–25090–RCJ, 97–25091–RCJ.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted June 23, 1999.

Decided Aug. 13, 1999.

---

NV, for Debbie Reynolds Hotel & Casino, Inc.

Bob L. Olson, Shea & Carlyon, Ltd., Las Vegas, NV, for Resort Funding, Inc.

Before RYAN, KLEIN, and BUFFORD,[1] Bankruptcy Judges.

## *OPINION*

RYAN, Bankruptcy Judge.

After confirmation of a chapter 11[2] liquidating plan, the bankruptcy court approved the sale of hotel and casino property belonging to debtors-in-possession Debbie Reynolds Hotel & Casino, Inc., Debbie Reynolds Management Company, Inc., and Debbie Reynolds Resorts, Inc. ("Debtors") for $10,650,000.

Debtors' attorney, Lenard Schwartzer of Hale, Lane, Peek, Dennison, Howard and Anderson, subsequently informed Resort Funding, Inc. ("RFI"), an oversecured creditor, that he intended to seek a surcharge against RFI and other secured creditors pursuant to § 506(c) for rendering services related to the maintenance and preservation of the property.

To settle the dispute between Schwartzer and RFI, Debtors and RFI entered into a settlement agreement (the "Agreement") that gave Schwartzer a $50,000 surcharge against RFI's secured claims and precluded all other parties from surcharging any of RFI's collateral.

Appellant Calstar Corporation ("Calstar"), an administrative claimant that loaned Debtor $150,000 postpetition on a superpriority basis pursuant to a court order, opposed the Agreement, arguing that it impermissibly altered the rights of creditors and was not in the best interest of the estates.

After a hearing, the bankruptcy court approved the Agreement, concluding that RFI was not subject to surcharge as a matter of law under § 506(c) because it

Jeffrey R. Sylvester, Sylvester & Polednak, Ltd., Las Vegas, NV, for Appellants.

Lenard E. Schwartzer, Hale, Lane, Peek, Dennison and Howard, Las Vegas,

1. Hon. Samuel L. Bufford, Bankruptcy Judge for the Central District of California, sitting by designation.

2. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

was oversecured. However, the court noted that RFI was not precluded from voluntarily paying Schwartzer for his expenses from its share of the sale proceeds. Calstar timely appealed.

We REVERSE.

## I. FACTS

In July 1997, Debtors filed their voluntary chapter 11 bankruptcy petitions. The three bankruptcy estates were jointly administered.

The bankruptcy court confirmed the Debtors' amended liquidating plan (the "Plan"), which provided for the sale of a Las Vegas hotel and casino owned and operated by Debtors (the "Property") to Central Florida Investments ("CFI") for $14 million. RFI, a creditor holding the first and third mortgages, did not object to the Plan because the sale would have paid its claims in full. The Plan also provided that the court could consider "alternative transactions," permitting parties to appear at a hearing and bid for the purchase of the Property for a sum in excess of $14 million.[3]

Calstar and CFI qualified as bidders pursuant to the terms of the confirmation order. At the close of bidding, CFI was awarded the right to purchase the Property after submitting the highest bid in the amount of $15,600,000. Calstar submitted a back-up bid of $15,500,000. On May 5, 1998, the court entered an order approving CFI's bid. The order provided that after CFI conducted its due diligence, CFI could terminate the transaction without penalty upon timely written notification. The order further provided that in the event that CFI provided notice of termination of the transaction or failed to close

the transaction, Calstar was entitled to purchase the Property for $15,500,000.

After CFI sent its notice of termination, Debtors borrowed $150,000 from Calstar to enable Debtors to continue the ongoing operation of the business. The postpetition financing was approved by the court on a superpriority basis under § 364(c).

Subsequent to the advancement of funds, Calstar concluded its due diligence and gave written notice of its decision to terminate the transaction without penalty. Debtors subsequently moved to amend the Plan to allow for a public auction of the Property. The court approved the amendment.

In August 1998, Titan Sports, Inc., d/b/a/ World Wrestling Federation, purchased the Property at public auction for $10,650,000. The Sale Order provided that the bankruptcy court reserved jurisdiction to consider a surcharge against the secured creditors for the attorney's fees of Schwartzer which benefitted the secured creditors. *See* Order Confirming Sale (Aug. 6, 1998) at 5. At the time of the auction, RFI was owed approximately $6.6 to $6.7 million on its secured claims.

Subsequent to the auction and prior to the payment of the RFI claims, Schwartzer advised RFI that he would request the court to surcharge all secured creditors who were paid from the sale proceeds for attorney's fees incurred in helping to maintain and preserve the Property.

In August 1998, Debtors and RFI entered into the Agreement which provided a surcharge in favor of Schwartzer in the amount of $50,000. The Agreement also precluded any other creditor, including Calstar, from surcharging any of RFI's collateral pursuant to § 506(c).[4] RFI

---

3. The confirmation order is not included in the excerpts of record. However, both parties similarly characterize the confirmation order in their myriad pleadings.

4. The Agreement provided in pertinent part:

 9. *Objections to RFI's Claims.* Upon approval of this Agreement, RFI's Secured

Claims and Unsecured Claim shall be irrevocably allowed and *no Debtor, creditor, administrative claimant or party in interest may:* (1) object to the allowance of or the payment of the First Priority Secured Claim, the Third Priority Claim and the Unsecured Claim of RFI; (2) seek subordination of any

agreed to reduce its secured claim for attorney's fees by $15,000.

Debtors subsequently filed a motion to approve the Agreement (the "Motion"). Calstar and the Unsecured Creditors Committee (the "Committee") opposed the Motion, arguing that the Agreement impermissibly altered the rights of creditors of the estate and impermissibly attempted to preclude creditors including Calstar from seeking to surcharge RFI.

The bankruptcy court deferred its ruling to provide Calstar and others an opportunity to file motions to surcharge secured creditors.

In October 1998, Calstar filed a motion (the "Surcharge Motion") to surcharge creditors RFI,[5] Galt Capital,[6] Greg Orman,[7] the Internal Revenue Service (the "IRS"),[8] Charter Leasing,[9] and Phoenix Leasing[10] pursuant to § 506(c) to pay for the maintenance and preservation of real and personal property owned by Debtors. RFI opposed the Surcharge Motion.

At the hearing on the Motion and the Surcharge Motion, the bankruptcy court approved the Agreement, determining that RFI was not subject to surcharge under § 506(c) because surcharge must "fall on

claim held by RFI against any of the Debtors; (3) seek to avoid any lien held by RFI against the Real Property except as provided in the Order Confirming Sale; (4) seek disgorgement of any payment made to RFI by Debtors; or (5) *seek to surcharge any of RFI's collateral pursuant to 11 U.S.C. § 506(c).*
Compromise & Settlement of Controversy at 6 (emphasis added).

5. RFI held the first and third mortgages on the Property with liens in excess of approximately $6.6 to $6.7 million. RFI also held a liquidated unsecured claim in the approximate amount of $116,000 and a contingent claim of approximately $2,246,000.

6. Galt Capital held the second mortgage on the Property in the approximate amount of $1,278,000.

7. Gregory Orman held the fourth mortgage on the Property in the approximate amount of $704,000.

the last ... secured creditor in line." Hr'g on Mot. to Approve Settlements and Mot. Pursuant to 506(c) for the Levy of a Surcharge for Administrative Expenses Against Secured Property (Oct. 28, 1998) at 99. The court essentially agreed with RFI's primary argument that § 506(c) did not apply to oversecured creditors. However, the court approved RFI's agreement to permit Schwartzer to surcharge RFI in the amount of $50,000 because although Schwartzer did not have the right to force RFI to pay the claim under § 506(c), RFI had the right to voluntarily pay Schwartzer from nonestate assets.[11]

Similarly, the court denied the Surcharge Motion, holding that Calstar had assumed the risk that it would not recover on its claim in the event that it did not consummate the purchase of the Property.

The order approving the Agreement (the "Compromise Order") was entered on November 25, 1998. Calstar timely appealed the Compromise Order.[12]

## II. ISSUES

A. Whether the bankruptcy court erred when it approved the provision in the Agreement precluding

8. The IRS held a secured claim against the Property in the approximate amount of $326,000.

9. Charter Leasing held a secured claim against personal property of the estate.

10. Phoenix Leasing also held a secured claim against personal property of the estate.

11. The court had previously allowed Schwartzer's claim for attorney's fees in the amount of $225,000.

12. The order denying the Surcharge Motion was entered on February 24, 1999, and Calstar filed a timely notice of appeal. This appeal is designated as NV-99-1140, and has not yet been assigned to a merits panel.

Consequently, we only have jurisdiction to consider issues involving the Compromise Order and not the order denying the Surcharge Motion.

Calstar from surcharging RFI because as a matter of law oversecured creditors are not subject to surcharge under § 506(c).

B. Whether § 506(c) can be used to pay an administrative claim in circumvention of superpriority rights granted under § 364(c)(1).

## III. STANDARD OF REVIEW

 We review the bankruptcy court's approval of a proposed compromise for an abuse of discretion. *See Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 420 (9th Cir. BAP 1997). However, to the extent that the Agreement involves an interpretation or application of § 506(c), we review the legal issue de novo. *See Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 324 (3d Cir.1995); *In re Phoenix Pipe & Tube, L.P.*, 174 B.R. 688, 692 (E.D.Pa. 1994); *see also Bank of Honolulu v. Anderson (In re Anderson)*, 66 B.R. 97, 99 (9th Cir. BAP 1986) (stating that although the bankruptcy court's determination of whether a real estate broker's expenses incurred while conducting a sale of estate property are chargeable against the sale proceeds is reviewed for an abuse of discretion, this discretion is limited by § 506(c)).

## IV. DISCUSSION

A. *The Bankruptcy Court Erred in Approving the Provision in the Agreement That Precluded Calstar from Surcharging RFI Under § 506(c).*

Calstar argues that the bankruptcy court erred in approving the Agreement because (1) the Agreement precluded all creditors other than Schwartzer from surcharging RFI based on an erroneous view of the law that oversecured creditors were not subject to surcharge under § 506(c) and (2) the surcharged sale proceeds should have been distributed to all unsecured creditors pursuant to § 726(a) rather than to Schwartzer.[13]

 In determining whether to approve a compromise, bankruptcy courts must find that the compromise is fair and equitable. *See Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir.), *cert. denied*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986). Courts must consider:

"(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

*Id.* (citations omitted). The party proposing the compromise "has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." *Id.*

 Here, the only dispute concerning the Agreement is whether the court erred as a matter of law in determining that an oversecured creditor could not be surcharged under § 506(c), thereby precluding Calstar from surcharging RFI. The general rule is that postpetition administrative expenses and the costs of reorganization may not be charged to or against secured collateral in bankruptcy. *See Central Bank of Mont. v. Cascade Hydraulics and Util. Serv., Inc. (In re Cas-*

---

13. Calstar also argues that the bankruptcy court erred in finding that Calstar assumed the risk of nonpayment of its claim in the event that it withdrew from the sale. We decline to consider this issue because it relates to the bankruptcy court's denial of the Motion, which is not before us. The immunizing language in the Compromise Order that precluded any other creditor from surcharg-

ing RFI was approved by the bankruptcy court because the court concluded as a matter of law that RFI, as an oversecured creditor, could not be surcharged.

The assumption of risk finding only relates to the order denying the Surcharge Motion, which is currently pending before another BAP panel.

*cade Hydraulics and Util. Serv., Inc.)*, 815 F.2d 546, 548 (9th Cir.1987). Rather, these expenses are chargeable against the unencumbered estate assets, thereby preserving for secured creditors the collateral securing the debtor's obligations. *Id.* "However, at common law the general rule was disregarded when a debtor, debtor in possession or trustee had expended funds to preserve or dispose of the very property (collateral) securing the debt." *Visual Indus.*, 57 F.3d at 324. This equitable exception has been codified in § 506(c). *See Cascade*, 815 F.2d at 548; *Visual Indus.*, 57 F.3d at 325.

▮▮▮▮ Section 506(c) allows a trustee, debtor-in-possession, and certain third-party claimants to recover reasonable expenses of preserving or maintaining estate property "to the extent of any benefit to the holder of [a secured] claim." 11 U.S.C. § 506(c) [14]; *North County Jeep and Renault, Inc. v. General Elec. Capital Corp. (In re Palomar Truck Corp.)*, 951 F.2d 229, 232 (9th Cir.1991) (holding that standing to assert a § 506(c) claim is not limited to trustees and debtors-in-possession), *cert. denied sub nom.*, 506 U.S. 821, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992). In order to recover expenses under § 506(c), the claimant must demonstrate that the incurred expenses were (1) reasonable, (2) necessary, and (3) beneficial to a secured creditor. *See Cascade*, 815 F.2d at 548. The Ninth Circuit has interpreted § 506(c) narrowly and requires the claimant to "establish in quantifiable terms that it expended funds directly to protect or preserve the collateral." *Id.* "Section 506(c) was not intended as a substitute for recovery of normal administrative expenses from the debtor's estate." *FDIC v. Jenson (In re Jenson)*, 980 F.2d 1254, 1260 (9th Cir.1992).

▮▮▮▮ Here, the bankruptcy court approved the Agreement including the im-

munizing language that "no Debtor, creditor, administrative claimant or party in interest may ... (5) seek to surcharge any of RFI's collateral pursuant to 11 U.S.C. § 506(c)" after finding that RFI was not subject to surcharge as a matter of law because it was oversecured. The court specifically stated that "because of my understanding of the law that [RFI was] not subject to the surcharge anyway, because it has to fall on the last priority creditor in line—secured creditor in line, I'm going to approve that settlement." Hr'g on Mot. to Approve Settlements and Mot. Pursuant to 506(c) for the Levy of a Surcharge for Administrative Expenses Against Secured Property (Oct. 28, 1998) at 99. This finding reflects a misunderstanding of § 506(c).

We have previously held that a claimant must only satisfy three requirements to recover a surcharge under § 506(c): "The expenses must be necessary and reasonable and are limited to the extent of the benefit to the secured party." *Anderson*, 66 B.R. at 100. The statute neither distinguishes between undersecured and oversecured creditors nor states that oversecured creditors do not fall within the class of secured creditors subject to surcharge. *See, e.g., In re Trim–X, Inc.*, 695 F.2d 296, 298 (7th Cir.1982). In *Trim–X*, the Seventh Circuit rejected the district court's legal conclusion that "when the value of secured property is less than the amount of the secured claim an award to a trustee under section 506(c) could never be clearly erroneous as being too small." *Id.* at 298. The court stated:

> Section 506(c) makes no reference to the relative values of the property securing an allowed claim and the claim itself. In contrast, section 506(b) ... does contain such language.... We think that Congress' omission of similar language from section 506(c) suggests that the relative

**14.** Section 506(c) provides:
The Trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of

preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.
11 U.S.C. § 506(c).

values of the property and the secured claim are not relevant considerations under that section.

*Id. See also In re Mechanical Maintenance, Inc.,* 128 B.R. 382, 389 (E.D.Pa. 1991) (agreeing with the *Trim–X* court that the relative values of the assets and the secured claims are not determinative factors under § 506(c)); *New York Nat'l Bank v. First Fidelity Bank,* 1991 WL 208813, at *3–4 (D.N.J.1991) (determining that the issue of whether an oversecured creditor received a direct benefit from the sale of collateral by the chapter 7 trustee is a question of fact and remanding to the bankruptcy court to quantify the benefit received by the oversecured creditor); *In re North County Place, Ltd.,* 92 B.R. 437, 446 (Bankr.C.D.Cal.1988) (rejecting an oversecured creditor's argument that it received no benefit by virtue of its status as an oversecured creditor and loss of an equity cushion).

Although a number of cases have held that § 506(c) does not apply when the creditor is oversecured (absent consent by the oversecured creditor), these cases reached this conclusion on the basis of no benefit because the secured creditor would have been paid in full regardless of the claimant's performance. *See In re Glen Eden Hosp., Inc.,* 202 B.R. 589, 590 (Bankr.E.D.Mich.1995); *In re Mall At One Assocs., L.P.,* 185 B.R. 981, 989 (Bankr. E.D.Pa.1995); *Guy v. Grogan (In re Staunton Indus., Inc.),* 75 B.R. 699, 702 (Bankr.E.D.Mich.1987); *In re Wyckoff,* 52 B.R. 164, 168 (Bankr.W.D.Mich.1985); *In re West Post Rd. Properties Corp.,* 44 B.R. 244, 247 (Bankr.S.D.N.Y.1984); *Moister v. Dekalb Federal Sav. & Loan Ass'n (In re Robertson),* 14 B.R. 706, 709 (Bankr. N.D.Ga.1981); *see also* Elliot D. Levin, *Who Gets the Goodies: What Happens to the Enhancement of the Secured Parties' Collateral Post–Petition?,* 102 Com.L.J. 55, 61–62 & n. 24 (Spring 1997) (and cases cited therein) ("As a general rule, a creditor, oversecured on the petition date, is not benefitted by any cost or expenses attributable to the collateral during the bankruptcy case. Any benefit accrues to junior lienholders or the estate.").

However, these cases do not support a per se rule that § 506(c) never permits oversecured creditors to be surcharged. While it may generally be the case that oversecured creditors do not benefit from efforts to preserve the collateral, the Code does not refer to the relative values of the collateral or the secured claim. *See Trim–X,* 695 F.2d at 298. We are unwilling to draw an inflexible rule of law that precludes a claimant from surcharging an oversecured creditor. *See In re Council,* 1990 WL 266353, at *3 n. 1 (Bankr. E.D.Cal. Nov. 14, 1990) ("The court cannot apply the mechanical rule urged by [Appellees] that a [§] 506(c) surcharge can never be applied against an oversecured creditor. Such a broad sweeping rule would completely ignore a fundamental rule of statutory interpretation that a statute should be interpreted to give full effect to the entire statute.").

Indeed, we can envision a situation in which an oversecured creditor may benefit from preservation of the collateral upon which its security interest attaches when the services rendered help to prevent a creditor from becoming undersecured. This determination would involve evidence of the value of the collateral assuming the services had not been provided. If the evidence shows that the going-concern value of the property enabled the creditor to get paid in full, benefit to the creditor would have occurred. *See, e.g., Levin, supra,* 102 Com.L.J. at 63–34 (and cases cited therein) (recognizing that expenses directly associated with preserving or improving the going concern value of the debtor's operation may be surcharged against the secured creditor to the extent that the creditor benefits from the rendered services). In such a situation, surcharging the oversecured creditor may be appropriate. Thus, we believe that the oversecured status of a creditor is merely a factor to be considered in determining

whether the creditor directly benefitted from the services. *See, e.g., Anderson,* 66 B.R. at 99 (stating that the issue of whether expenses were reasonable, necessary, and benefitted the secured creditor is a question of fact that is reviewed for clear error); *In re 680 Fifth Avenue Assocs.,* 154 B.R. 38, 43–44 (Bankr.S.D.N.Y.1993); *Federal Land Bank of Louisville v. Belew (In re Belew),* 44 B.R. 12, 13 (Bankr. N.D.Ala.1984).

Here, the bankruptcy court found that RFI benefitted from the auction sale, preservation of timeshares, and avoidance of title problems and a foreclosure sale, but found as a matter of law that RFI could not be surcharged because a surcharge had "to fall on the last lien creditor in line." Hr'g on Mot. to Approve Settlements and Mot. Pursuant to 506(c) for the Levy of a Surcharge for Administrative Expenses Against Secured Property (Oct. 28, 1998) at 99. Similarly, the court found that Calstar's loan to Debtors was responsible for the continued operation of the business, thereby benefitting "the secured creditors." *Id.* at 95. However, the court never attempted to determine whether RFI directly benefitted from the loan because it concluded that RFI was not subject to surcharge as a matter of law and Calstar had assumed the risk that it would not be repaid if it did not consummate the purchase of the Property.

■ "The definition of benefit encompasses more than the bottom line of a balance sheet." *Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings),* 799 F.2d 91, 94 (3d Cir.1986). Assuming that Calstar's superpriority loan allowed RFI to recover more as a going concern than it would have recovered in a foreclosure sale, RFI would have received a benefit. *See, e.g., In re Lunan Family Restaurants Ltd. Partnership,* 192 B.R. 173, 179 (Bankr.N.D.Ill.1996) ("Costs expended while keeping the Debtor running as a going concern may be charged to the secured creditor where maintaining the going-concern value actually and specifically

benefitted [sic] the secured creditor.") (citations omitted). "Section 506(c) permits a surcharge against collateral even where the value of the collateral has declined through use or market fluctuations." *North County Place,* 92 B.R. at 444 (citing 4 L. KING, COLLIER ON BANKRUPTCY ¶ 552.02 (15th ed.1988)).

As stated supra, the bankruptcy court did find such a benefit to "secured creditors" without determining whether RFI in particular received a benefit. Thus, the bankruptcy court's holding that RFI was precluded from surcharge under § 506(c) as a matter of law was erroneous.

■ In addition, the bankruptcy court erred to the extent that its holding was based on the view that only the most junior secured creditor was subject to surcharge as a matter of law under § 506(c). Again, neither the plain language of § 506(c) nor the legislative history indicates that only the most junior secured creditor may be surcharged for necessary and reasonable expenses that provide a direct benefit to secured creditors. Rather, whether a benefit has been conferred on a creditor is a question of fact. *See Anderson,* 66 B.R. at 99 (citing *Trim–X,* 695 F.2d at 299 n. 4). Again, although it is likely that a senior, oversecured creditor would not benefit from services rendered to preserve or maintain property that benefits junior secured creditors, this may not always be the case. Indeed, if a senior, oversecured creditor would have been rendered undersecured absent the services, then a surcharge would be appropriate because the creditor received a direct and quantifiable benefit. Here, however, the bankruptcy court did not conduct a benefit analysis because of its erroneous view of the law. Thus, the bankruptcy court erred when it applied a per se rule that only the most junior secured creditor could be surcharged under § 506(c) in lieu of conducting a benefit analysis.

For the foregoing reasons, the bankruptcy court's approval of the immunizing

language that precluded any creditor other than Schwartzer from surcharging RFI was based on an erroneous view of § 506(c).[15]

B. *The Bankruptcy Court's Approval of the $50,000 Surcharge in Favor of Schwartzer Was Erroneous Because the Distribution to Schwartzer Impermissibly Altered Calstar's § 364(c) Superpriority Claim.*

■ Calstar argues that the bankruptcy court erred in approving the surcharge in favor of Schwartzer to the exclusion of Calstar because the surcharged funds should have been distributed to the bankruptcy estate rather than to Schwartzer.

Debtor and Schwartzer argue that the policy favoring parity of payment to all claimants in a class under § 726 does not apply in the chapter 11 context. *See Palomar,* 951 F.2d at 232; *Kitrosser v. CIT Group/Factoring, Inc.,* 177 B.R. 458, 469 (S.D.N.Y.1995) ("Although the requirements of Chapter 7 are in general not applicable to Chapter 11 proceedings ..., Section 726 does apply through the requirements of Section 1129."); 6 L. KING, COLLIER ON BANKRUPTCY ¶ 726.01 (15th ed. rev.1998) (recognizing that the distribution rules of § 726 directly apply only in chapter 7 liquidation cases, and indirectly apply in chapter 11 through the best interest of creditors test in § 1129).

Although Calstar does not question the validity of the § 506(c) surcharge,[16] it challenges the distribution of the $50,000 directly to Schwartzer rather than to the estate because the payment enabled Schwartzer to get paid on a mere administrative claim ahead of Calstar, the holder of a superpriority claim under § 364(c). We agree.

■ The bankruptcy court's use of § 506(c) to circumvent § 364(c)(1) and the priority scheme of the Code was erroneous.

"Section 506(c) does not entitle a trustee to recover personal compensation directly from a secured creditor. Rather, it allows a trustee acting in his statutory role as representative of the estate, *see* 11 U.S.C. § 323(a) ..., to recover the expenses incurred by the estate in preserving or disposing of the property securing the creditor's claim. If he recovers such expenses, 'the recovered funds become available as an unencumbered asset for distribution to the [unsecured] creditors.' *In re JKJ Chevrolet, Inc.,* 26 F.3d 481, 484 (4th Cir.1994). The trustee may then seek personal compensation from the estate."

*In re Ben Franklin Retail Store, Inc.,* 210 B.R. 315, 317–18 (Bankr.N.D.Ill.1997) (quoting *In re Pink Cadillac Assocs.,* 1997 WL 164282, at *4 (S.D.N.Y., Apr. 8, 1997)). This same rationale applies in a chapter 11 case to a debtor-in-possession through § 1107. *Id.* at 317; *cf. Palomar,* 951 F.2d at 231 (stating that the legislative history extends standing to assert a § 506(c) claim to debtors-in-possession as well as trustees). Thus, as a general rule, § 506(c) "is a reimbursement provision for the benefit of the estate, not an independent compensation provision available to a trustee or any other claimant seeking personal compensation." *Ben Franklin,* 210 B.R. at 317 n. 4.

■ The Ninth Circuit recognizes a limited exception to the general rule where asserting the claim would not benefit the bankruptcy estate. *See Palomar,* 951 F.2d at 231–32. In such a situation, the Ninth

---

**15.** We note that Calstar argued before the bankruptcy court that RFI consented to and benefitted from the sale of the Property, and thus, absent the infusion of capital from Calstar, a voluntary sale would not have been possible. *See* Calstar's Reply to Obj. of Resort Funding, Inc. at 8–10. However, the issue of consent was abandoned on appeal.

**16.** The Ninth Circuit has held that § 506(c) "was not intended as a substitute for recovery of normal administrative expenses from the debtor's estate." *Jenson,* 980 F.2d at 1260.

Circuit has held that a third-party claimant has standing to request a surcharge under § 506(c) on its own behalf lest the secured creditor receive a windfall at the claimant's expense. *Id.*

However, *Palomar* is limited to its facts, *id.* at 232, and does not apply to the situation here where Debtors requested the surcharge under § 506(c).

Although we agree with Debtors' and Schwartzer's argument that § 726's policy favoring parity of payment does not apply in chapter 11, the priority scheme of § 507 does apply in chapter 11. *See* 11 U.S.C. § 1129(a)(9); 4 L. KING, COLLIER ON BANKRUPTCY ¶ 507.02[7]. Section 1129 sets forth the requirements for confirmation of a chapter 11 plan. A chapter 11 plan may not be confirmed unless the holders of unclassified claims of a kind specified in §§ 507(a)(1) and (a)(2) receive cash equal to the allowed amount of such claims, except to the extent that the holder of a particular claim consents to different treatment. *See* 11 U.S.C. § 1129(a)(9)(A). Section 507 provides that administrative expenses under § 503(b) have first priority. *See* 11 U.S.C. § 507(a)(1). Section 503(b) provides that there shall be allowed administrative expenses for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1). In addition, § 364(c) provides that a trustee or debtor-in-possession may obtain credit or incur debt *with a superpriority over any or all administrative expenses of the kind specified in §§ 503(b) or 507(b).* *See* 11 U.S.C. § 364(c)(1). "A Section 364(c)(1) superpriority may affect the rights of administrative claimants to full payment in the event sufficient funds are unavailable by subjecting them to reduction and proration." *In re American Resources Management Corp.,* 51 B.R. 713, 721 (Bankr.D.Utah 1985) (citations omitted) (holding in an involuntary chapter 11 case that payment of professional fees from estate property sub-

ject to a § 364(c)(1) superpriority claim was inappropriate).

Here, it is undisputed that Calstar held a claim under § 364(c)(1) that had superpriority over Schwartzer's administrative claim under §§ 507(a) and 503(b). Although the Plan was not included in the excerpts of record, the Plan could not have been confirmed unless, absent consent, it provided for the payment of claims of a kind specified in §§ 507(a)(1) and (a)(2). *See* 11 U.S.C. § 1129(a)(9)(A). While § 503 administrative expenses constitute the highest priority in § 507, " § 364 establishes an expense that has priority over all priority expenses and claims: the super priority administrative expense." *State Bank of Waubay v. Bisgard,* 80 B.R. 491, 495 (D.S.D.1987). Thus, under the Plan, Calstar was entitled to recover on its claim before Schwartzer recovered his administrative expenses. *See* 11 U.S.C. § 364(c).

The bankruptcy court impermissibly circumvented this requirement by approving the distribution of the surcharged funds to Schwartzer under § 506(c) while Calstar had not recovered on its superpriority claim. " 'Section 507 is intended to be the exclusive list of priorities in bankruptcy. Priorities are to be fixed by Congress. Courts are not free to fashion their own rules of superpriorities or subpriorities within any given priority class.' " *Adventure Resources, Inc. v. Holland,* 137 F.3d 786, 796–97 (4th Cir.1998) (quoting 3 L. KING, COLLIER ON BANKRUPTCY ¶ 507.02[2] (15th ed.1996)), *cert. denied,* —— U.S. ——, 119 S.Ct. 404, 142 L.Ed.2d 328 (1998). "It is imperative to the orderly administration of the bankruptcy process that § 507 remains, unless otherwise clearly specified by Congress, the final word on the priorities of competing claims." *Id.* at 797. Because Schwartzer bore the risk of nonpayment or partial payment as a result of Debtors' superpriority borrowing from Calstar under § 364, *see American Resources Management Corp.,* 51 B.R. at 721, the bankruptcy court's use of § 506(c) to pay Schwartzer at the expense of Cals-

**842**

tar was improper. *Cf. Adventure Resources,* 137 F.3d at 796–97.

Accordingly, the bankruptcy court erred when it authorized the § 506(c) distribution to Schwartzer at the expense of Calstar's superpriority claim.

## V. CONCLUSION

In sum, the bankruptcy court erred in ruling that RFI was not subject to surcharge as a matter of law under § 506(c) because it was an oversecured creditor and only the most junior secured creditor could be surcharged. The bankruptcy court was required to conduct a benefit analysis to determine whether a § 506(c) surcharge was appropriate rather than applying a per se rule.

The bankruptcy court also erred in approving the distribution of the surcharge to Schwartzer at the expense of Calstar's superpriority claim.

REVERSED.