**In re CANN & SAUL STEEL COMPANY also d/b/a Alburtis Machine Shop, Debtor.**

**Bankruptcy No. 87–01153S.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 19, 1988.

Lawrence J. Tabas, Philadelphia, Pa., for debtor.

Robert S. Bernstein, Pittsburgh, Pa., for Creditors' Committee.

Alan C. Gershenson, Earl T. Stamm, Philadelphia, Pa., for Bank.

Susan F. Drogalis, James J. O'Connell, Office of the U.S. Trustee, Philadelphia, Pa., U.S. Trustees.

Norman A. Lavin, Sithe Energies Group, New York City, Touche Ross & Co., c/o Leonard Santavasi, Philadelphia, Pa., accountant.

### OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

At issue is a reprise to the controversy between the Debtor in this Chapter 11 case,

filed March 9, 1987, and a creditor having a lien on all assets of the Debtor to secure a debt admittedly in excess of the value of the assets, which we addressed in a prior Opinion reported at 76 B.R. 479. In dispute is the troublesome issue of whether, upon the Debtor's failure to successfully reorganize, the Debtor's counsel and accountant and counsel for the Official Creditors' Committee (hereinafter referred to collectively as "the Professionals") are entitled to compensation from the assets of the Debtor's estate on the basis of 11 U.S.C. § 506(c). We hold that the Professionals do have standing to seek compensation under § 506(c), but that any constitutional rights of the Debtor compromised by disallowing full compensation to them are more than offset by the observation that a contrary conclusion would adversely impact on the constitutional rights of Continental Bank, the creditor (hereinafter referred to as "the Bank"). We believe that ascertainment of precisely what services are properly collectible by the Professionals from estate assets, and ultimately from the Bank, as "reasonable, necessary costs and expenses of preserving, or disposing of" secured property of the estate under § 506(c) is intensely fact-determinative. Such a determination, we conclude, involves both a subjective and an objective assessment of the Professionals' actions. We therefore refrain from making a determination of precisely what the Professionals are entitled to recover at this juncture, preferring to set down fairly specific guidelines as to categories of compensation and expenses which we believe to be reimburseable and requiring the parties to identify the specific requests and objections thereto in a subsequent process.

In our previous Opinion, dated August 5, 1987, we provisionally allowed the Debtor to use cash collateral and denied the Bank's motion seeking relief from the automatic stay, subject to, *inter alia*, the Debtor's preparation of a Plan of Reorganization and Disclosure Statement on or before September 23, 1987, and the Debtor's remitting monthly payments increasing by increments of $15,000.00 to the Bank. 76 B.R. at 489–90. In October, 1987, a detente was reached between the parties, due to the emergence of a potential purchaser of all of the Debtor's assets. An Amended Plan which contemplated the purchaser's paying a sum slightly in excess of $3 million, which the Bank agreed to accept in full payment, was filed on October 28, 1987.

Unfortunately, on December 17, 1987, the purchaser, to the Debtor's great surprise and disappointment, advised that its arrangements for financing the purchase had fallen through. Being unable to find another purchaser and being unable to keep up with either its projections or the payment schedule devised in our Order, the Debtor was compelled to agree that an orderly liquidation, with sale proceeds going to the Bank, was the sole recourse. Counsel for the Debtor and the Bank have worked beside each other in this endeavor, and a further Amended Plan and Disclosure Statement of the Debtor is targeted and has been ordered by this court to be filed on or before June 1, 1988.

On November 10, 1987, the Professionals filed the instant Applications, seeking compensation for services performed for the Debtor in the mostly turbulent period between March, 1987, when the case was filed, and the end of October, 1987. The Debtor's counsel sought compensation of $130,019.00 and costs of $2,250.51, less a $25,000.00 retainer. The accountant sought compensation of $67,296.00 and costs of $4,058.64, less a $50,000.00 retainer. The Creditors' Committee sought a total sum of $11,847.08 in compensation and expenses through the date of confirmation.

The United States Trustee filed objections to certain specific entries on the Applications. However, the Bank filed a global Objection to the Applications, asserting that the Debtor had no assets unemcumbered by its security interests and that, without its consent, no compensation could be paid to any of the Professionals out of estate proceeds. It noted that, as early as March 18, 1987, it had expressly refused to consent to allow any estate assets to be utilized to pay professional fees.

A hearing on the Bank's Objections to the Applications was conducted on March 25, 1988. The Professionals called David L. Freed, the Debtor's President; L. William Brehm, the Bank officer servicing the Debtor's loan; and Norman A. Lavin, of Touche Ross & Co., the Accountant. The parties agreed that the record from the hearing on the motions decided in our August 5, 1987, Opinion; the Plans and Disclosure Statements and exhibits thereto; certain correspondence; and certain facts relating to the collapse of the anticipated purchase transaction could be entered into the record here. In addition, Mr. Freed testified to counsel's negotiations to reduce the demands of certain creditors; to effect a bailment agreement with Westinghouse Electric Co. whereby the latter purchased raw materials for the Debtor to manufacture for it, see 76 B.R. at 479, 480, 481; and, with the Bank's blessing, to attempt to sell the business. He also pointed out that the Debtor's filing and stiff resistance of the Bank's efforts to liquidate had netted the Bank $426,000.00 in payments over the additional year that the Debtor had remained in business, pursuant to that portion of our Order requiring the Debtor to make period payments, 76 B.R. at 489, while preserving its going-concern value. Mr. Brehm conceded that the Bank had encouraged the Debtor's efforts to sell the business and had voted for the Amended Plan before that Plan was dashed by the proposed purchaser's withdrawal. Mr. Lavin produced a chart calculating that, counting the payments to the Bank, the value of the Bank's interest in the Debtor had appreciated in value by almost $400,000.00 in the intervening year, although he conceded that the Bank had lost almost $300,000.00 in potential interest through delay in its receiving funds through the Debtor's liquidation by reason of the bankruptcy proceedings.

At the close of the hearing, we established a briefing schedule which was completed by the Bank's submission of a Reply Brief on April 22, 1988. Throughout the hearing and the briefing, counsel were mutually respectful of the efforts and energies of each other, reinforcing our own observation that all parties have acted vigorously yet professionally in this matter despite their differences.

The tension between professionals and creditors whose security extends to all of a debtor's assets has been an issue which this court has addressed on numerous occasions. Every judge who has sat in this court since the enactment of the Code has issued at least one published decision on the issue. *See In re Daulerio,* 71 B.R. 112 (Bankr. E.D.Pa. 1987), *remanded,* C.A. No. 87–2287 (E.D.Pa. July 1, 1987), *modified* (Bankr.E.D.Pa. Nov. 5, 1987), *appeal dismissed,* C.A. No. 87–7923 (E.D.Pa. March 9, 1988) (SCHOLL, J.); *In re Birdsboro Casting Corp.,* 69 B.R. 955 (Bankr.E.D.Pa.1987) (FOX, J.); *In re Fazio,* 57 B.R. 316 (Bankr.E.D.Pa.1986) (GOLDHABER, CH. J.); *In re Baum's Bologna, Inc.,* 50 B.R. 689 (Bankr.E.D.Pa.1985) (TWARDOWSKI, J.); and *In re Hotel Associates, Inc.,* 6 B.R. 108 (Bankr.E.D.Pa.1980) (KING, J.).

The Second Circuit has issued two well-known Opinions directly addressing this topic, *In re Flagstaff Foodservice Corp.,* 762 F.2d 10 (1985), and 739 F.2d 73 (1984). The Third Circuit has contributed a number of cases involving efforts of trustees to obtain compensation from estate proceeds in sales of realty which was fully secured under the Bankruptcy Act, the precise situation presented to us in *Daulerio. In re Pioneer Sample Book Co.,* 374 F.2d 953, 959–60 (3d Cir.1967); *In re Street,* 184 F.2d 710, 711–12 (3d Cir.1950); and *Miners Savings Bank of Pittston v. Joyce,* 97 F.2d 973, 977 (3d Cir.1938). However, perhaps even more pertinent was that Court's decision in *In re McKeesport Steel Castings Co.,* 799 F.2d 91 (3d Cir.1986), wherein it held that a gas supplier was entitled to recover for post-petition services as against secured creditors under 11 U.S.C. § 506(c).

■ The Debtor's counsel devotes its attention to three arguments in support of the Professionals' claim. First, he argues that the Professionals have standing to invoke § 506(c), which is the basis of their claim and which reads as follows:

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Although, on its face, § 506(c) appears to limit parties entitled to invoke it to the trustee, the Court of Appeals, in *McKeesport*, had little difficulty in extending its application to a creditor. The decisions of this Court after *McKeesport* have, in turn, had little difficulty in extending its application to, as here, claims by a debtor's professionals. *See Daulerio, supra*, 71 B.R. at 115; and *Birdsboro, supra*, 69 B.R. at 958. Hence, the Bank wisely concedes that, under the Third Circuit decisions, the Professionals have standing to invoke § 506(c).

The Debtor also devotes considerable space to a "public policy" argument that culminates in a contention that refusing to grant the Professionals compensation would deny the Debtor of its purported due process right of access to the bankruptcy court to pursue a bankruptcy reorganization. In doing so, the Debtor relies principally upon *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), in which the Court held that denial of access of an indigent to the courts to obtain a divorce *in forma pauperis* constituted a denial of due process. Unfortunately, the Professionals are confronted with several significant hurdles in asserting this reasoning. First is the principle that there is no sixth amendment right to counsel in civil cases. *See, e.g., Lassiter v. Department of Social Services of Durham Co., N.C.*, 452 U.S. 18, 24–28, 101 S.Ct. 2153, 2158–2160, 68 L.Ed.2d 640 (1981); *Caruth v. Pinkney*, 683 F.2d 1044, 1048 (7th Cir.1982); *United States v. McQuade*, 647 F.2d 938, 940 (9th Cir.1981); and *Watson v. Moss*, 619 F.2d 775, 776 (8th Cir.1980). Consequently, it is quite clear that an indigent debtor has no right to appointed counsel in a bankruptcy proceeding. *See In re Martin–Trigona*, 737 F.2d 1254, 1260–61 (2d Cir.1984), *cert. denied*, 474 U.S. 1061, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986); *Department of Banking & Finance, State of Nebraska v. Copple*, 84 B.R. 163, 164 (Bankr.D.Neb.1988);

and *In re Flowers*, 83 B.R. 953, 953–54 (Bankr.N.D.Ohio 1988). The Debtor is therefore forced into the uncomfortable position of arguing that it is "unfortunate" that there is no sixth amendment right to counsel in civil cases. While this court may agree with this sentiment expressed by the Professionals, we are compelled to label this argument as no more than a sentiment which no court has elevated to a principle of law.

Secondly, the Supreme Court expressly limited the applicability of the reasoning of *Boddie* to bankruptcy proceedings in *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). There, the Court stated that filing bankruptcy is not a right in denying an indigent an opportunity to file a bankruptcy petition *in forma pauperis*. *Id.* at 445–48, 93 S.Ct. at 637–40. We have held that an absolute bar of any group of parties from permission to file bankruptcy is unconstitutional. *See In re Zawisza*, 73 B.R. 929, 934 (Bankr.E.D.Pa. 1987). However, we do not believe that the Professionals' claim for payment of compensation from secured estate funds rises to the same level as barring an incompetent from filing bankruptcy under any conditions, the situation which we faced in *Zawisza*. *Compare Lassiter, supra*, 452 U.S. at 27–34, 101 S.Ct. at 2159–2163 (denial of counsel to indigent in parental termination proceeding is neither violative of procedural due process nor fundamental fairness).

Painfully aware of *Kras*, the Professionals are ultimately forced to reason as follows:

The Court in *Kras* was wrong in saying that bankruptcy is not a Constitutional right. It must be such a right as it is a fundamental underpinning of our economic and democratic society. The dissent in *Kras* illuminates that concept and should be adopted as the law.

Memorandum of Law in Support of Application of Charin and Goldberg for Interim Compensation and for Reimbursement of Expenses, at 36. Unfortunately for the Professionals, *stare decisis* is a clearly recognizable "underpinning" of our decision-making process, and we are not free to

follow a dissenting opinion of the Supreme Court.

Even if we might attempt to limit the holding of *Kras* to its facts and join with the Professionals in championing a right to appointed counsel in bankruptcy, we would not be inclined to hold that a debtor is entitled to counsel which would effectively be compensated by his secured creditor. The Bank also has certain constitutional rights, not the least of which is its right to due process of law before it can be deprived of the extent of the value of its property in a bankruptcy proceeding. *See, e.g., United States v. Security Industrial Bank*, 459 U.S. 70, 75–78, 103 S.Ct. 407, 410–12, 74 L.Ed.2d 235 (1982); *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 515–18, 58 S.Ct. 1025, 1032–34, 82 L.Ed. 1490 (1938); and *In re Timbers of Inwood Forest Associates, Ltd.*, 793 F.2d 1380, 1390–91 & n. 4 (5th Cir.1986), *reinstated en banc*, 808 F.2d 363 (5th Cir.1987), *aff'd sub nom. United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, — U.S. —, 108 S.Ct. 626, 98 L.Ed. 2d 740 (1988). We believe that providing that a debtor has a right to attempt to reorganize at the expense of the value of the interest of an undersecured or fully secured creditor in the debtor's property would collide with these due process rights of the creditor.

■ Therefore, on grounds of lack of logical as well as precedential support, we must reject the Professionals' argument that they or their client have any constitutional right to the compensation sought.

The third argument of the Professionals is that, under § 506(c), as interpreted by at least the local courts, they are entitled to compensation for three types of services which they allege resulted in "benefit" to the Bank: (1) Services relating to preservation of the Bank's collateral; (2) General administrative bankruptcy services; and (3) The litigation with the Bank itself[!] resolved in our prior Opinion.

In the *Flagstaff* decisions, the court posits a very narrow concept of "benefit" to the secured party. It concludes that only services which *directly* benefited the se-

cured party, to the exclusion of all other parties, are compensable. 739 F.2d at 75–76. The Court states that it would require "strained logic" to conclude that the secured party benefited from general reorganizational efforts which resulted in only incidental benefit to the secured party. *Id.* at 76. Thus, there, no compensation was allowed to the debtor's professionals at all.

The reasoning in *Fazio* and *Baum* follows that of *Flagstaff*. Judge Goldhaber utilizes the self-same phraseology of *Flagstaff* in concluding that it would require "strained logic" to conclude that a secured party benefited, in the § 506(c) sense, from services performed in general administration of the bankruptcy. 57 B.R. at 317. In *Baum*, Judge Twardowski declines all compensation to the debtor's attorney, even while acknowledging "indirect benefit" to the secured creditor for services "undertaken to improve the position of the debtor in possession." 50 B.R. at 690.

At the opposite end of the spectrum is Judge King's pre-*Flagstaff* opinion in *Hotel Associates*. There, Judge King builds upon the secured creditor's motion for appointment of a trustee to conclude that the secured creditor gave implied consent to the trustee appointed to perform a full range of services for the debtor's estate. Thus, he awards the trustee full compensation sought for all services rendered.

In *Birdsboro*, Judge Fox does not cite to *Hotel Associates*, but does conclude that, in *McKeesport*, "the Third Circuit has interpreted section 506(c) less restrictively than the Second Circuit [in *Flagstaff*]." 69 B.R. at 958. Indeed, in *McKeesport*, the Court expressly stated an intention to adopt the "much broader" test set forth in *In re Afco Enterprises, Inc.*, 35 B.R. 512 (Bankr.D. Utah 1983), in interpreting § 506(c), as opposed to the narrower test articulated in *Flagstaff* and the Third Circuit itself in the Act case of *Miners Savings Bank v. Joyce, supra*, 799 F.2d at 94. The test articulated in *McKeesport* relied more upon whether the secured party gained actual benefit from the efforts of the party seeking to invoke § 506(c), not whether this benefit was direct or indirect, whether it benefited

others or not, or whether it was intended to or did benefit others as well. However, in *Birdsboro,* Judge Fox concluded that the debtor's counsel had not met his burden of establishing any direct benefit to the creditor, and hence no compensation was awarded.

In *Daulerio,* we were faced with a creditor, the Internal Revenue Service (hereinafter "IRS"), that was uncharacteristically somnambulant in objecting to the payment of any of the considerable fees claimed by the debtors' counsel. 71 B.R. at 113–14. However, the debtors' counsel, in its ultimate request for compensation, scaled down its request to only those services which it contended enhanced the IRS's lien position relative to the proceeds in issue. No compensation for general administrative bankruptcy services was sought, nor, or course, was awarded. However, even at that, we reduced the compensation sought to the *Daulerio* debtors' counsel to that which we believed *actually* benefited the IRS. In so doing, we also issued the only decision rendered by the judges of this court in this area which was less than an all-or-nothing result in the quest of a professional for compensation from secured estate funds.

■ We are inclined to reach the same sort of mixed result here. We believe that some of the services performed by the Professionals directly benefited the Bank and some did not. We further believe that only those which did actually benefit the Bank are compensable. Whether the services were intended to benefit only the Bank, or could be classified as general administrative bankruptcy services or not, is ultimately not very relevant.

However, there is one other consideration which we believe balances a full-scale determination in favor of the Professionals. That is that the Professionals should not be able to obtain compensation for services which the Bank reasonably and specifically requested that they *not* perform. The Bank must retain the right to decline services, lest it be saddled with liability for officious undertakings of professionals hired by the Debtor in a paternalistic mode

of doing something for the Bank's own good despite its resistance.

We believe that both objective and subjective tests must be employed in determining what undertakings by the Professionals were compensable and which were not. Services which the Bank specifically and reasonably declined should not be compensable. Professionals should not be compensated for any services on behalf of a debtor whose entire concept of a reorganization is fatally flawed. *Compare In re Gulph Woods Corp.,* 84 B.R. 961 (Bankr.E.D.Pa. 1988). However, a stone-walling creditor could conceivably be chargeable with a full range of services which it unreasonably declined to countenance. Thus, a secured creditor cannot totally insulate itself from any liability under § 506(c) by a well-timed letter "warning" the debtor's professionals, nor can a debtor claim compensation for a full range of services simply because a creditor failed to ever dispatch such a letter.

Here, the Bank did dispatch a disclaiming letter at an early stage. Further, however, here we believe that both parties and their counsel acted in a responsible and totally reasonable manner. In light of this, we conclude that the Professionals cannot obtain compensation for services rendered in litigation against the Bank, to which the Bank clearly did not and was in no sense obliged to finance, nor can they obtain compensation from the estate for general administrative bankruptcy services which did not directly benefit the Bank. We hold that any such services were expressly and reasonably declined by the Bank and hence are not chargeable to the estate.

This eliminates a good deal of the compensation sought by any of the Professionals in this particular batch of Applications. However, it does not eliminate all of it. Any efforts by the Professionals to implement the Westinghouse bailment agreement, reductions in utility company demands, or pension plan benefit reductions benefited the Bank directly and should be compensable. All services performed in sale negotiations, to which the Bank gave its imprimatur, should be compensable.

Although work on the original Plan of Reorganization and Disclosure Statement unacceptable to the Bank should not be compensable, work on the revised Plan and Disclosure Statement which were undertaken to accommodate the Bank and for which the Bank voted its acceptance should be compensable. Although general bankruptcy administrative services should not be compensable until the serious negotiations for a plan acceptable to the Bank began, once they did begin in this vein, such services were directly beneficial to the Bank and should be compensable.

It is impossible for us to designate all of the services which meet our criteria as compensable and those which do not without the further participation from the parties in the process. We will therefore require the parties to undertake a procedure similar to that which we utilized after the remand of our original Order in *Daulerio* on the ground that we had not revealed our computation process with sufficient clarity. There, requested by the district court to explain our determinations as to what services were compensable in detail, we required the party requesting compensation to specifically designate what was requested, on an entry-by-entry basis, and the objecting party to respond with any objections on an entry-by-entry basis.

Finally, we note some ambiguity in the posture of the Bank towards the retainers received by the Debtor's counsel and accountant, respectively. At the trial, the Bank expressed an intention to seek recovery of all of these sums for the estate and, ultimately, to itself. However, at the close of its Brief, it states merely that "*if* it should elect, it is the bank which could *conceivably* seek the return" of the retainers (emphasis added). Memorandum of Law of Continental Bank in Opposition to Applications of Professionals for Interim Compensation and Reimbursement of Expenses, at 24. This softening of the Bank's position is a development which, under the circumstances, we believe to be both just and commendable. In light of this statement and because the engagement of at least the Debtor's counsel was not at an end as of October 31, 1987, the value of compensable services, even in the case of the accountant, may ultimately exceed the respective retainers. Thus, the retainers may be offset by compensable services prior to the end of the case. Therefore, we shall not order the Professionals to return any of the retainers received to the estate at this time.

We shall proceed to enter an Order setting forth the process for resolving this controversy in the manner described in this Opinion.

## ORDER

AND NOW, this 19th day of May, 1988, after a hearing of March 15, 1988, on the Objections of Continental Bank (hereinafter referred to as "the Bank") to the Applications of Charen and Goldberg, Touche Ross & Co., and Bernstein & Bernstein, P.C. (hereinafter referred to as "the Professionals") for Allowances of Interim Compensation and Reimbursement of Costs, and consideration of the Briefs of the interested parties, it is hereby ORDERED as follows:

1. The Professionals are each directed to supply the Bank, the United States Trustee (hereinafter "the Trustee"), and this Court with copies of marked-up or revised Applications for Compensation, designating precisely what entries for services and expenses they believe to be within the scope of the services deemed to be generally compensable in the foregoing Opinion, with a brief statement of the reason therefor, on or before June 3, 1988.

2. The Bank and the Trustee are accorded the opportunity to respond to any such designations by marking, or otherwise designating any entries for services or expenses designated by the Professionals which they believe are not compensable within the scope of services deemed to be generally compensable in the foregoing Opinion, with a brief statement of the reasons therefor, on or before June 20, 1988.

3. If any party requests a further hearing, it shall indicate same with its statement. The court will determine whether such a hearing is necessary or appropriate.

*See In re Metro Transportation Co.,* 78 B.R. 416, 417 (Bankr.E.D.Pa.1987).

4. The original copy of the submissions made in accordance with the within Order shall be filed with the Clerk of this Court and copies sent to opposing counsel and delivered to the court on or before 4:30 P.M. on the respective dates indicated at the following address:

The Honorable David A. Scholl
United States Bankruptcy Judge
3722 United States Court House
601 Market Street
Philadelphia, PA 19106–1763.