**In re ORFA CORPORATION OF PHILADELPHIA, Debtor.**

**In re ORFA CORP. OF AMERICA, Debtor.**

**In re ORFA CORPORATION OF AMERICA (DEL.), Debtor.**

**Bankruptcy Nos. 90–11253S to 90–11255S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 22, 1993.

Christine Shubert, Tabernacle, NJ, Trustee.

Harold Kaplan, Camden, NJ, for Chapter 7 Trustee.

Allen B. Dubroff, Astor, Weiss & Newman, Philadelphia, PA, for debtor.

Robert S. Taylor, Lewis, Eckert, Robb & Co., Plymouth Meeting, PA, Trustee.

Christopher Kuhn, Silberman, Markovitz, Meo & Raslavich, Philadelphia, PA, for Chapter 11 Trustee.

Karen Lee Turner, Philadelphia, PA, for Bank of America.

Matthew H. Krekstein, Philadelphia, PA, for Creditors' Committee.

Frederick D. Lipman, Earl M. Forte, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Plan Proponents.

Michael L. Temin, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for Licensors.

Jeffrey Kurtzman, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, PA, for certain bondholders.

Warren Pratt, Drinker Biddle & Reath, Philadelphia, PA, for Bruce Energy Centre.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before this court is a Motion ("the Motion") of ROBERT S. TAYLOR, the former Chapter 11 Trustee in the above-captioned related bankruptcy cases prior to their conversion to Chapter 7 cases ("the Trustee"), seeking to compel the Bank of America, N.T. & S.A. ("BOA") to pay whatever statutory commissions he may be granted and to pay $160,730.39 previously awarded, and whatever additional sums are awarded, to his counsel, the law firm of Silberman, Markovitz, & Raslavich ("SMR"). The Motion is based in law upon 11 U.S.C. § 506(c) and upon the fact that the Trustee and SMR were brought into the case on a motion for appointment of a trustee which BOA's predecessor, Security Pacific National Bank ("SPNB"), joined and actively supported.

We reject the Trustee's contention that we can focus solely upon BOA's consent to his appointment as a basis for allowing all of the sums requested, even those arising from actions which were directly opposed by BOA and which he has not proven benefitted its interest. On the other hand, we reject BOA's contention that we focus solely on its benefit from the Trustee's actions as a basis for denying any relief under § 506(c), since its consent is, in our view, also a proper element to consider.

We order, first, that the Trustee file a request for commissions and for SMR to file a final fee application on or before February 26, 1993. We also direct that these parties, at that time, designate precisely which services on these compensation requests, and SMR's outstanding fee application as allowed, they contend were consented to by BOA and/or benefitted its interests. After providing BOA an opportunity to respond, we will enter an appropriate Order.

### B. FACTUAL AND PROCEDURAL HISTORY

The three underlying, related bankruptcy cases were filed together as voluntary Chapter 11 cases on March 20, 1990. The history of these cases can be explored in detail by review of decisions published at 115 B.R. 799, 801–02 (June 20, 1990, and July 20, 1990) ("*Orfa I*") (holding that the Debtors' previous management had the authority to file these cases); 121 B.R. 294, 296 (November 21, 1990) ("*Orfa II*") (holding that the single creditors' committee appointed in all three cases was sufficient); 129 B.R. 404, 407–09 (July 2, 1991) ("*Orfa III*") (denying confirmation of a plan presented by a group of former investors in the Debtors ("the Plan Proponents"), but allowing the Plan Proponents to file an amended plan); and 22 B.C.D. 427, 427–28, 1991 WL 225985 ("*Orfa IV*") (October 30, 1991) (confirming an amended plan presented by the Plan Proponents).

At the time of the filings, ORFA CORP. OF PHILADELPHIA ("ORFAPHIL") was the owner of a waste processing facility located in Philadelphia, PA ("the Property"). ORFA CORP. OF AMERICA (Del.) ("ORFADEL") was the licensor of an al-

leged environmentally-advanced technology for recycling solid waste owned by Jetser Technologie, B.V. and Organ–Faser Technology ("the Licensors") and known as the Orfa process ("the Licenses"). ORFA CORP. OF AMERICA ("ORFAM") was the parent corporation which managed ORFA-PHIL and ORFADEL.

SPNB was the primary secured creditor of the Debtors, having financed the construction of an Orfa-process demonstration plant on the Property. At the time that the Debtors commenced their bankruptcy cases, their indebtedness to SPNB was approximately $8 million. This debt was secured by a lien on the property from ORFAPHIL, and by certain other assets of the Debtor, notably a guarantee from ORFADEL secured by the Licenses.

After weathering the challenges to the filings of these cases, the Debtors' original management team was unable to secure financing to operate the Debtors. On or about May 22, 1990, SPNB filed its initial Motion for Relief from the Automatic Stay ("the Stay Motion") to permit it to foreclose on the Property. The hearing on the Stay Motion was continued to a later date as of June 25, 1990, when the Official Unsecured Creditors' Committee ("the Committee") of all three Debtors, see Orfa II, supra, filed a Motion for the Appointment of Chapter 11 Liquidating Trustee or in the Alternative for Conversion to a Chapter 7 Proceeding ("the Trustee Motion"). The Trustee Motion contended that a trustee was required because the Debtors were (1) incurring significant costs of administration, (2) mismanaging their affairs, (3) incompetent to manage their affairs, (4) unable to generate any sales causing a loss in the value of the estate, and (5) unable to effectuate a plan and had no reasonable likelihood of rehabilitation. SPNB, on July 6, 1990, filed a Joinder to the Trustee Motion ("the Joinder").

This court held a hearing on the Trustee Motion on July 19, 1990. Thereafter, we granted the Trustee Motion, although we deleted the term "liquidating" from the proposed Order appointing the Trustee, and we denied the request to convert the cases to Chapter 7. On August 9, 1990, we entered an order appointing the Trustee. SMR filed a successful Application for appointment as counsel for the Trustee on August 17, 1990.

Also, on August 17, 1990, SPNB filed a praecipe re-listing the Stay Motion for a hearing on August 30, 1990. We learned, at that hearing, that the Trustee's initial decision was to liquidate the Debtors by agreeing to allow SPNB to foreclose on the Property and selling the licenses to BRUCE ENERGY CENTER, INC. ("BEC") for $3 million to use as a basis for forming a competing waste-disposal plan for Toronto, Canada. However, the Trustee reported that he had reconsidered his initial position in light of a proposal of the Plan Proponents, led by Alexander Cappello, to prepare a plan of reorganization which would allow the Debtors to repair and successfully operate the plant under the Licenses. Ultimately, we entered an Order conditioning SPNB's relief from the stay on the failure of the Plan Proponents to produce a confirmable plan by September 28, 1990.

On September 12, 1990, we heard the Trustee's motion to sell the Licenses to BEC. The Committee, joined by certain of the Debtors' noteholders and the Plan Proponents, opposed the Motion. SPNB and BEC supported it. The Trustee indicated his ambivalence concerning his own motion, and the court denied it. Thereafter, the Trustee supported, though with some expression of reservations, the efforts of the Plan Proponents to reorganize the Debtor. After several unsuccessful efforts to secure the Licenses for itself before a time-deadline in the Toronto competition lapsed, BEC lost interest in the cases and SPNB/BOA became the isolated opponent of the efforts of the Plan Proponents to reorganize the Debtors.

On October 11, 1990, SPNB sought to neutralize some of its opposition by attacking the Committee for failing to properly represent the interests of the creditors of ORFADEL, who presumably would benefit from the sale of the Licenses to BEC. The Committee took the position that a reorga-

nization which included the Property and the Licenses was preferable to liquidation of the Licenses. This effort of SPNB was rebuffed in *Orfa II*. It is noteworthy that SPNB/BOA never sought to attack or remove the Trustee, even though he (and the United States Trustee) supported the Committee in its opposition to the attack on it.

A lengthy and hotly-contested confirmation process culminated in hearings to consider confirmation of the plan of the Plan Proponents on December 19–21, 1990. *See Orfa III*, 129 B.R. at 407–09. Thereafter, by agreement of the parties, this court enlisted the assistance of the Honorable Judith H. Wizmur of the District of New Jersey in substantial, and at times apparently successful, efforts, extending from January, 1991, through June, 1991, to negotiate a consensual plan between, principally, SPNB and the Plan Proponents. To the dismay of the other interested parties, including the Trustee, who was an active participant in the negotiations, these efforts failed. We were then compelled to render the decisions reflected by *Orfa III* and *Orfa IV*, which resulted in confirmation of a plan of the Plan Proponents which was supported by the Trustee and all other interested parties except SPNB. These decisions were the subject of constant protests and several appeals by SPNB.

Unfortunately, the Plan Proponents were never able to obtain the financing package necessary to make the plan effective. The bevy of appeals by SPNB from the confirmation Order, ironically, prevented, under the terms of the plan, the attainment of its effective date, since the effective date was triggered by an unappealable order of confirmation. SPNB's strategy thereafter was to continue to file a series of "renewed" motions for relief from the stay or to convert the cases to Chapter 7. The court generally conditioned the continuance of the stay on the Plan Proponents' payment of sums to the Trustee necessary to insure and secure the Property. In February, 1992, the Plan Proponents submitted funds for an insurance payment of $25,000 one day beyond a court deadline, which SPNB claimed resulted in automatic relief from the stay as to it. This proved little practical help to SPNB because its foreclosure efforts were apparently stalled by the pendency of its own numerous appeals from the confirmation and other orders.

After a hearing of April 1, 1992, on one of SPNB's renewed motions to convert these cases to Chapter 7, this court determined that the stalemate between the Plan Proponents and SPNB had gone on long enough. Upon Cappello's statement that the plan would be funded in at most 120 days, we ordered that, unless the funding were in place by a continued hearing date of August 5, 1992, the court would seriously consider converting the cases to Chapter 7 cases at that time.

On August 5, 1992, SPNB, then about to become BOA, advised us that it was negotiating a resolution with a new entity in which Cappello and others were involved, which contemplated a payout of $4 million to it in consideration of its release of its liens on the Property. At the mutual request of BOA and the Plan Proponents, we continued the hearing on conversion several times, ultimately making clear that, if the negotiations were not finalized by September 24, 1992, we would convert the cases to Chapter 7 cases on that date. No finalized plans were presented on that date, and we converted these cases to Chapter 7 cases on September 24, 1992, despite the continuing objections of the Trustee and the other interested parties to a conversion which would leave them with bleak prospects of payment. We note that these objections diminished in intensity as the Plan Proponents' inability to actually deliver became more likely.

Christine Shubert, Esquire, was appointed as the Chapter 7 Trustee ("the 7 Trustee") on October 6, 1992. Requests by the Plan Proponents to reconsider our conversion Order to allow them yet additional time to come up with funding were supported by all interested parties except the Licensors, including BOA. This court, however, set a December 2, 1992, deadline for such efforts and, when the Plan Proponents' evidence consisted (again) of promises unsupported by fulfillment, the recon-

sideration motion was denied on December 2, 1992.

After the reconsideration motion was denied, the 7 Trustee expressed an intention to abandon the Property to BOA. On January 12, 1993, the 7 Trustee withdrew her motion to extend the time to assume the Licenses. These actions by the 7 Trustee apparently reflect resignation regarding the potential of a successful plan or negotiated settlement, and a belief that these cases will end in no-asset liquidations.

The genesis of the instant Motion could be said to have occurred on May 5, 1992, when SMR filed an Application seeking compensation of $177,367.50 for fees and $2,156.89 for reimbursement for costs for the period from July 17, 1990, to March 31, 1992. After a hearing on Objections of SPNB (principally contending that the Application should have been broken down among the three Debtors' estates) and others, we reduced the sums awarded to $158,-664.50 in fees and $2,065.89 in costs, or a total of $160,730.39, in an unappealed Order of June 24, 1992. The Order also recited that no payments were to be made until distribution was accomplished under the confirmed plan.

Perceiving that the date of the payment under that Order might never come, the Trustee, on August 12, 1992, filed the Motion at issue and requested that BOA be compelled to pay the allowed compensation awards obtained from this court by him and SMR for the administration of the Debtors' estates. The only substantive law cited in support of this relief was 11 U.S.C. § 506(c). BOA filed responses to the Motion which included a Motion to dismiss the Motion before us on the ground that it was improperly not brought as an adversarial proceeding.

During the period of negotiations between BOA and the Plan Proponents, the terms of which reportedly included an agreement for the Trustee and SMR to be paid their claims, the parties prepared prehearings Briefs and continued the hearing on the Motion until the final day of reckoning for the Debtors on December 2, 1992. On that date, we denied BOA's motion to dismiss the instant Motion, as well as the Plan Proponents' motion to reconsider the conversion Order, and prepared to take testimony on the instant Motion.

SMR indicated that the Trustee was unavailable to testify on that date and requested that the record be kept open to permit him to testify later. However, Richard Berkman, Esquire, who initially represented SPNB in this case ("Berkman"), was called as a witness by the Trustee.

Berkman testified that SPNB filed the Joinder because the Property was not secured, insured, or properly maintained, and because all of the parties, at that time, agreed that the sale and liquidation of the Debtors' assets represented the best interests of all of the creditors. Further, it was anticipated that the sale of the Licenses to BEC would produce sufficient unencumbered assets to pay for administrative expenses.

Berkman also testified that, following discussions with the proposed trustee, Christopher Kuhn, Esquire, a partner in SMR who represented the Trustee throughout the cases ("Kuhn"), an agreement was drafted by SPNB which provided that SPNB would pay the Trustee $25,000 to market and sell the Property. After further discussions, the proposed agreement was revised and the provision for the $25,-000 payment was deleted, since it was agreed that the stay would be lifted and the Property returned to SPNB. Berkman stated that, consequently, the parties appeared before this court on August 10, 1992, and advised us that SPNB's Motion for Relief would be continued, since the parties had agreed to lift the stay and a stipulation of the parties agreement would be filed with the court. However, upon return from a short vacation later in August, Berkman stated that he learned that the stipulation would not be filed, because the Trustee no longer agreed to lift the stay and was now contesting SPNB's Motion for Relief.

Upon the conclusion of Berkman's testimony, the hearing was continued for completion on December 10, 1992. At that time, the Trustee, Kuhn, and Matthew

Krekstein, Esquire, counsel for the Committee ("Krekstein"), testified.

Kuhn, beginning this round of testimony, stated that he had been contacted by Krekstein and advised that the court had ordered the appointment of trustee in the Debtors' case and that he had been selected as the consensus candidate for that position. Thereafter, on July 27, 1990, Kuhn reported that he attended meetings with Krekstein, Berkman, Warren Pratt, Esquire, counsel for BEC ("Pratt"), and Frederick D. Lipman, Esquire, lead counsel for the Plan Proponents, wherein Pratt presented a proposal to purchase the Licenses and reorganize the Debtors through a BEC's plan.

Kuhn also testified that, at these meetings, he spoke with Berkman regarding SPNB's request for relief and the issue of administrative expenses. He stated that, as a result, he believed that SPNB was aware of its liability for the expenses and was attempting to limit its exposure by offering the Stipulation to limit his fees to $25,000. However, he stated that he advised Berkman that he would not agree to any such limitation.

Kuhn then reported that, subsequently, he was advised that the United States Trustee had appointed the Trustee, and not him, as the Chapter 11 trustee for the Debtors, for reasons he was unable to explain. The Trustee, however, reportedly at the advice of the United States Trustee, asked to appoint Kuhn's firm as his counsel.

Kuhn further testified that the proposal advanced by Pratt was subsequently revised to solely an offer to purchase the licenses by BEC. He indicated that this offer, if approved, would have provided sufficient unencumbered assets to pay the Debtors' administrative claims. He further stated that, while the Trustee initially looked favorably upon the offer, he became "reluctant" to endorse it because the Plan Proponents ultimately indicated a willingness to reorganize the Debtors with the Licenses as a centerpiece. A sale of the Licenses, per Kuhn, could have compromised the Trustee's duty to all of the credi-

tors, which he believed would be served by the proposed reorganization.

Krekstein testified that he had discussions with Berkman regarding the Debtors' lack of competent management, and the health hazards, inadequate security, and proper insurance for the Property; that he suggested that the Trustee Motion be filed; and that Berkman agreed. He stated the term "liquidating" trustee was included in that motion to accommodate Berkman and in hopes of preventing Berkman from filing a motion for a Chapter 7 trustee. Thereafter, Berkman agreed to continue SPNB's Motion for Relief pending the resolution of the Trustee Motion. However, he stated that no agreements were made to limit SPNB's liability for administrative expense, and that Berkman did not indicate that his support of the Trustee Motion was conditioned upon the appointment of a "liquidating" trustee.

The Trustee testified that, shortly after his appointment, he met with Berkman to discuss SPNB's position and interest in the cases. Berkman advised him of SPNB's desire to liquidate the Property, since it was Berkman's opinion that it was not of value to the Debtors' estates. It was following this discussion that the Trustee stated that he initially concluded that returning the Property to SPNB represented the best course of action. However, following personal inspection of the Property and discussions with other interested parties, he concluded that Berkman's assessment of the Debtors was incorrect and that opposition to SPNB's Motion for Relief and reorganization of the Debtors represented the most prudent exercise of his fiduciary duty to all creditors. He further testified that he had not agreed with Berkman or any other party to waive his full administrative fees in the cases.

At the close of the Trustee's case in support of the instant Motion, BOA, in lieu of presenting witnesses, successfully requested introduction into evidence of the records of this court's proceedings on July 19, 1990; September 12, 1990; October 23, 1991; January 22, 1992; February 5, 1992; and June 24, 1992; this court's orders dat-

ed August 9, 1990; January 23, 1992; February 6, 1992; and April 7, 1992; the December 19, 1991, renewed motion of SPNB for relief and the Plan Proponents' answer thereto; SPNB's February 20, 1992, certificate of alleged expiration of the automatic stay; SMR's Fee Application; and copies of July 24, 1990, and August 15, 1990, draft stipulations regarding the appointment of the Trustee. BOA agreed to compile this evidence and submit copies to the court and the interested parties.

At the close of BOA's case, brief arguments were presented by counsel for both the Trustee and for BOA. We suggested that the court's ruling might be facilitated if SMR reviewed its fee application and highlighted those activities which it believed definitely benefitted BOA. SMR expressed its reluctance to do so, since it maintained the position that it was entitled to recover all of the expenses incurred by it in connection with administration of the Debtors' estates. We then entered an order requiring BOA to submit all materials to be included in the record by December 21, 1992, and permitting the parties to file simultaneous post-trial Briefs by January 11, 1993. Both the materials and briefs were timely submitted to the court by the parties. On January 14, 1993, BOA filed a motion to strike from the Trustee's Brief a discussion by the Trustee explaining an exhibit to his Brief in which he allowed that services totalling $17,862.00 could be deleted as activities directly in opposition to SPNB/BOA's positions ("the Strike Motion").

## C. DISCUSSION

### 1. *THE INSTANT MOTION WAS FILED PURSUANT TO 11 U.S.C. § 506(c), AND THIS COURT MUST CONSIDER IT IN THAT LIGHT.*

BOA raises several procedural objections to the instant Motion. The Motion and its accompanying proposed Order requested that BOA be compelled to pay all of the allowed statutory commissions of the Trustee and of the fees and costs awarded to SMR. However, the Motion itself and the subsequently-filed Briefs of the Trust-

ee indicate that the Motion is substantively based solely upon 11 U.S.C. § 506(c) of the Bankruptcy Code, which provides as follows:

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

█ It is clear to us that, since § 506(c) contemplates a recovery from a secured creditor's property, if the secured creditor retains its security interest and/or obtains the secured property, it may then be liable to a trustee and his professionals for the "reasonable, necessary costs and expenses ... of preserving, or disposing of, such property." It must be recalled that the controlling decision in this court, *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94–95 (3rd Cir.1986), mandates a broad and functional interpretation of 11 U.S.C. § 506(c).

█ BOA's argument that this court lacks jurisdiction over this issue because it had previously obtained relief from the automatic stay as to the Property in February, 1992, lacks merit for several reasons. Firstly, it is doubtful that SPNB actually was entitled to relief as a result of the February, 1992, occurrences; this is a unilateral assertion by BOA which no court has upheld. Secondly, even if BOA had obtained relief, § 506(c) contemplates that the secured creditor *will* recover the secured property to trigger the "benefit" to the security holder from the trustee's "preservative" actions. The very act of allowing the secured creditor to receive benefit which triggers § 506(c) should therefore not oust the bankruptcy court's jurisdiction over such matters. Thirdly, it is well-established that a creditor's obtaining relief from the automatic stay as to certain property does not in itself always eliminate bankruptcy court jurisdiction over that property. *See In re Fricker*, 113 B.R. 856, 864 (Bankr.E.D.Pa.1990). *Compare In re Anderson*, 129 B.R. 44, 48–49 (Bankr. E.D.Pa.1991). Fourthly, issues involving professional compensation, particularly

those of a bankruptcy-created trustee and his counsel, are core proceedings, 28 U.S.C. § 157(b)(2)(A), within the exclusive jurisdiction of the bankruptcy court. *See In re United Church of Ministers of God,* 74 B.R. 271, 277–78 (Bankr.E.D.Pa.1987).

Similarly, we reiterate our rejection of BOA's argument that this Motion should have been brought as an adversary proceeding, blended with a contention that other interested parties, such as the Committee or the Plan Proponents, should share the costs of services provided by the Trustee and SMR. This Motion will not be treated by the court as some sort of proceeding based on 11 U.S.C. § 105(a) to enforce equitable claims of the Trustee against BOA. The Trustee has invoked only § 506(c). The latter Code section provides the Trustee with recourse only as to secured creditors. BOA appears to be the Debtors' only secured creditor. It alone could possibly be liable to the Trustee under § 506(c).

We believe that the Trustee has created some measure of confusion by seeking, in effect, a declaration that his potential administrative claims are subject to assessment against BOA's secured property, without first establishing his entitlement to such claims. There is some precedent for this procedure in *In re Hotel Associates, Inc.,* 6 B.R. 108, 113–14 (Bankr.E.D.Pa. 1980). The result, however, can only be no more than that achieved in *Hotel Associates:* a few generalized declarations which can later be applied to the specific claims of the Trustee.

It is unclear whether the Trustee has any claim to commissions. If so, BOA correctly points out that the Trustee must justify same under the guidelines established in such cases as *In re Orient River Investments, Ltd.,* 133 B.R. 729, 730–31 (Bankr. E.D.Pa.1991); *In re Leedy Mortgage Co.,* 126 B.R. 907, 915–19 (Bankr.E.D.Pa.1991); and *In re Samson Industries, Inc.,* 108 B.R. 545, 549–51 (Bankr.E.D.Pa.1989). Until he has done so, quantification of any award to him is impossible. The issue may even be hypothetical, as the Trustee may not be entitled to any commissions under 11 U.S.C. § 326(a).

Similarly, SMR has submitted an Application for its services for which it requests payment from BOA through only March 31, 1992. We anticipate that substantially more compensation will be sought by SMR for services performed during the period from April 1, 1992, through the date of appointment of the 7 Trustee on October 6, 1992.

In order to facilitate the process of resolution of the issues raised in the Motion, we are establishing a bar date of February 26, 1993, for the Trustee and SMR, as well as any other Chapter 11 administrative claimants, including professional persons, to file Chapter 11 administrative claims. We believe that only with these applications in hand can the process of determining the Trustee's and SMR's entitlements under § 506(c) begin in earnest. We will also facilitate this process by directing the Trustee and SMR to designate on any new Applications and SMR to designate, on its previous Application, whether they claim that particular services benefitted BOA's property and/or were consented to by BOA, within the contours provided in this Opinion, and briefly explain the basis for this contention as to each entry for which compensation from BOA is claimed, by the February 26, 1993, deadline.

In light of these observations, it becomes clear that BOA's Motion to Strike is not well-taken, and will be denied herewith. The Trustee has clearly not submitted all of his and his professional's fee requests at this time. These Applications will have to be marked up, as we will now order, for us to finally decide these issues. The present markings on the Exhibits to the Trustee's post-trial Brief may not be relevant in light of the instant, specific directives. We also reject the notion that, by refusing to mark up its initial fee application prior to the hearings in December, 1992, the Trustee adopted an "all or nothing" position which presently estops him from making his requests in what we deem is the proper, restricted format. *Compare In re Cann & Saul Steel Co.,* 86 B.R. 413, 419–20 (Bankr. E.D.Pa.1988) (professionals seeking full amount of compensation from a secured

creditor under § 506(c) were authorized to submit marked-up revised applications after this court denied the applications in full).

2. *THE TRUSTEE AND SMR MUST SATISFY EITHER THE "OBJECTIVE" OR THE "SUBJECTIVE" TESTS REFERENCED IN CANN & SAUL BEFORE THEY CAN BE ALLOWED COMPENSATION UNDER § 506(c).*

▉ After review of the parties' Briefs, we believe that both parties have not fully considered the views which this court expressed regarding the scope and vitality of § 506(c) in *Cann & Saul, supra.* We will reiterate those principles, as there have been no recent developments in this area which cause us to change our views as expressed therein. We do acknowledge that some adaptations are necessary in light of the differences between the facts of *Cann & Saul* and those of this case. However, these are the only additions/revisions which we deem appropriate to our *Cann & Saul* analysis.

On its face, § 506(c) requires that the Trustee establish a benefit to BOA's secured property as a result of his services as a precondition to recovery of any payments from BOA. The parties, particularly the Trustee, present very little analysis of the issue of general benefits received by BOA as a result of his services. There is likewise very little discussion of this issue in *Cann & Saul,* but that is because, there, the secured creditor implicitly conceded that, in effectuating the ultimate consensual plan featuring the sale of the debtor's secured property, *see* 86 B.R. at 414, it realized as much or more from the secured property as it would have had it gone through foreclosure at the outset of the case.

It is not clear what, if anything, SPNB would have done with the Property and realized from it in 1990. If the plan proposed by the Plan Proponents had become effective, there is little doubt that the Property's value would have been greatly enhanced. The Plan contemplated repair and retrofitting of the Property. The Plan Proponents presented evidence supporting the conclusion that, even if the Property were used as a transfer station, apart from its repair and use as a model for the Orfa process, the value of the Property was more than SPNB's second debt of about $8 million. *See Orfa III, supra,* 129 B.R. at 412. In the recent negotiations, BOA was prepared to give up its claims against the Property if it were paid $4 million. It is difficult to quantify, in a macro-economic sense, whether the value of the Property increased or decreased between 1990 and 1993. Without such proof, the Trustee appears incapable of proving a benefit to SPNB/BOA as a result of his decision to cast his course of action with the proposals of the Plan Proponents.

We can see that the value of the Property would undoubtedly be less today than it would otherwise have been had the Property been vandalized without adequate insurance, which could have occurred had the Trustee not been in place during this period. Therefore, actions of the Trustee and SMR which were directly dedicated to the preservation of the Property would seem to be compensable, as having provided a benefit to the Property.

However, as we stated in *Cann & Saul, supra,* 86 B.R. at 418,

> both objective and subjective tests must be employed in determining what undertakings by the Professionals were compensable and which were not. Services which the Bank specifically and reasonably declined should not be compensable. Professionals should not be compensated for any services on behalf of a debtor whose entire concept of a reorganization is fatally flawed. *Compare In re Gulph Woods Corp.,* 84 B.R. 961 (Bankr. E.D.Pa.1988). However, a stone-walling creditor could conceivably be chargeable with a full range of services which it unreasonably declined to countenance. Thus, a secured creditor cannot totally insulate itself from any liability under § 506(c) by a well-timed letter "warning" the debtor's professionals, nor can a debtor claim compensation for a full

range of services simply because a creditor failed to ever dispatch such a letter.

. . . All services performed in sale negotiations, to which the Bank gave its imprimatur, should be compensable.

Thus, we recognized, in *Cann & Saul*, that the issue of "benefit," for purposes of § 506(c), cannot be resolved solely on the basis of hindsight, *i.e.*, ascertaining whether the secured creditor did actually benefit financially from the intervention of the services for which § 506(c) compensation is sought. That is only the application of the "objective test."

However, there is also a "subjective test," which arises from an analysis of the element of consent by the secured creditor to a professional's actions. The secured lender should not be able to call upon a professional to perform services on its behalf, and then deny payment to the professional because hindsight proves that the services did not provide the anticipated benefit. *Accord, In re Bob Grissett Golf Shoppes, Inc.*, 50 B.R. 598, 602–05 (Bankr. E.D.Va.1985); and *Hotel Associates, supra*, 6 B.R. at 111–12.

It is clear that the element of " 'consent is not to be lightly conferred.' " *Bob Grissett, supra*, 50 B.R. at 603, quoting *In re S & S Industries, Inc.*, 30 B.R. 395, 398 (Bankr.E.D.Mich.1983). *See also In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 77 (2d Cir.1984); *In re CD Electric Co.*, 146 B.R. 786, 788 (Bankr.N.D.Ind.1992); and *In re Birdsboro Casting Corp.*, 69 B.R. 955, 959 n. 3 (Bankr.E.D.Pa.1987).

In *Cann & Saul*, there was not much of an issue on this point. Clearly, the secured creditor did not authorize the debtor's counsel, whom we allowed to use § 506(c) only on the basis of the holding in *McKeesport*, 86 B.R. at 416, to file a bankruptcy which halted its foreclosure efforts and continued to oppose such efforts after the filing. Only the relatively small category of services to which the secured party gave its "imprimatur" were deemed to fall into the category of acts to which the secured creditor consented.

Here, the Trustee's very existence came into being only because of the Trustee Motion, to which SPNB filed its Joinder. Therefore, the element of SPNB/BOA's consent by the Trustee's presence was provided at the outset of their relationship. The difficult issue presented by the instant Motion is whether and, if so, when, the consent of BOA to the creation of the Trustee ended.

We cannot accept the Trustee's argument that, once SPNB supported his appointment, it was bound to compensate him for every service reasonably performed by him, irrespective of the benefit attained by SPNB/BOA as a result of these services, and irrespective of the obvious disapproval of those services by SPNB/BOA. If the Trustee could prove a benefit to BOA in the macro-economic sense, as the result of his actions, then we believe that payment from BOA for all services would be mandated. However, if the Trustee is unable to shoulder this burden on this issue, as it appears is the case here, *see* page 798 *supra*, then the Trustee and SMR have failed the "objective test." An "implied consent," flowing from the mere act of supporting the Trustee's appointment, appears to be too weak a fulfillment of the "subjective test" in itself to allow the Trustee to prevail against SPNB/BOA under § 506(c).

SPNB/BOA's disapproval of the Trustee's actions commenced at the August 30, 1990, hearing. They were clearly manifested as to most of the Trustee's actions by the time that the Plan Proponents filed their plan on September 28, 1990. Arguably, the Trustee benefitted SPNB/BOA when he attempted to help it negotiate a resolution with the Plan Proponents before Judge Wizmur in early 1991. The presence of the Trustee in the 1992 negotiations between BOA and the Plan Proponents, although we understand that it was limited, would also appear to rise to the level of consensually beneficial action. In addition, at all times actions of the Trustee which were directly related with preservation of the Property would appear to be compensable. There may be a few other categories of services which we would deem consensu-

al, *e.g.,* it is possible that the Trustee's actions against BEC benefitted at least BOA's alleged security interest in the Licenses. However, general administrative services during the periods of an adversarial relationship between the Trustee and BOA do not meet the "subjective test" under § 506(c). If they also are not proven to meet the "objective test," the Trustee's requests under § 506(c) for these periods must fail.

We do not, therefore, accept several of the arguments made by the Trustee. The Trustee argues that SPNB/BOA, by moving for the appointment of an independent trustee, cannot be heard to complain when that very independence caused him to bite the hand that created him and which he therefore assumed would feed him.

We agree that the Trustee's actions were reasonable. Support of the Plan Proponents' proposal was quite proper. If the plan had become effective, all creditors, including SPNB/BOA, would have stood to gain financially. It is, moreover, this court's perception that the confrontational mode developed by SPNB/BOA from September, 1990, and thereafter was not only excessive and grossly wasteful to the time resources of the court and the financial resources of all involved, but self-defeating. The staunch and unrelenting opposition of SPNB/BOA to a resolution on any but its own terms appears to have destroyed the willingness of any financier to invest in the Debtors.[1] Scorched earth tactics bring just rewards to those who utilize them. Moreover, we note that the ultimate and rather sad but necessary resolution of these cases as unsuccessful did not occur due to acts of SPNB/BOA in its filing constant, repetitious motions asking for the same result of capitulation from its opposition, but the court's *sua sponte* establishment of deadlines for the Plan Proponents' proposals which they could not meet. *See Cann & Saul, supra,* 86 B.R. at 418 ("a stone-walling creditor could conceivably be chargeable with a full range of services

which it unreasonably declined to countenance").

The Trustee also argues that claims similar to those made by him here, *i.e.,* that a secured creditor who sought appointment of a trustee must foot the bill for all of the trustee's administrative expenses, were successful in the two most analogous cases, *Bob Grissett, supra;* and *Hotel Associates, supra.* However, the Trustee in *Bob Grissett* succeeded only in establishing his right to recover a $3,000 statutory commission for selling encumbered property. 50 B.R. at 609. The *Hotel Associates* court awarded nothing to the Trustee, pending his proof that he actually did preserve the encumbered property. 6 B.R. at 113–14. Both of these bottom-line results are a far cry from allowing a trustee or his counsel to recover hundreds of thousands of dollars from services which were performed in direct opposition to the secured creditor's positions.

■ Even in light of all of these observations, which may affect our ultimate determination, we nevertheless cannot conclude on the instant record, that either the "objective test" or the "subjective test" is met as to many of the services for which compensation is sought by the Trustee. Appearances at which the Trustee, either expressly or by clear implication, supported the Plan Proponents against SPNB/BOA are not compensable.

The Trustee also argued that his appointment required his presence at most or all hearings in the case, and that his expressions of support or disapproval, being relatively mild ones in which he and his counsel deferred to other counsel to take the lead, were basically irrelevant in content and impact, and should therefore be compensated by SPNB/BOA, despite their anti-SPNB/BOA content.

We cannot accept this nihilistic evaluation of the Trustee's role. We can truthfully say that the Trustee's viewpoints on matters before the court in this case were always important, often because he and his

---

1. We therefore reject any assertions by BOA that its perception of the Proponents' Plan as not being an ultimately-successful vehicle for resolution as "right" and those of the other participants in the case proven to be "wrong." The "prophecy" of SPNB/BOA appears to have been largely self-fulfilling—and, for that reason, self-destructive.

counsel were relatively disengaged and therefore objective. Therefore, had the Trustee firmly pressed the motion to sell the Licenses to BEC or strongly opposed the Plan Proponents' efforts as visionary, the result of this court's decisions on these important issues in this case may well have been different.

Ultimately, the Trustee must live with his decision to support the Plan Proponents. One element of this decision may have been self-interest. The confirmed plan, like any confirmable plan, *see* 11 U.S.C. § 1129(a)(9)(A), contemplated paying all administrative claims in full, including those of the Trustee and his counsel. We cannot ask the Trustee to be a self-depriving saint in the performance of his duties. But however reasonable the Trustee's positions were, this factor alone does not justify our compelling SPNB/BOA to accept the Trustee's viewpoints on matters which it viewed quite differently.

On the other hand, SPNB/BOA is hardly blameless in running up the claims of the Trustee. Nor did it ever seek to have the Trustee removed for acting improperly despite his opposition to its positions. The decisions in *Bob Grissett* and *Hotel Associates* are those most closely on point, and they do support a recovery for the Trustee and SMR without proof of actual benefit to the respective secured creditors who requested the appointment of the respective trustees.

We hope that BOA will view the issue before us with a more conciliatory and long-range viewpoint than it has other issues presented by these cases in the past, and agree to compensate (possibly) the Trustee and (certainly) SMR in reasonable amounts, rather than accumulating tens of thousands of its own legal costs to try to avoid paying thousands to disinterested parties who generally performed their duties well.

### D. CONCLUSION

An Order setting forth the directives referenced in the foregoing Opinion will be entered.

### ORDER

AND NOW, this 22nd day of January, 1993, after hearings of December 2, 1992, and December 10, 1992, on the Trustee's Motion to Compel Bank of America, N.T. & S.A. ("BOA") to Pay Administrative Expense, and review of the parties' respective Pre–Trial and Post–Trial Memoranda, and the Motion of BOA to Strike portions of the Trustee's Post–Trial Memoranda ("the Motion to Strike"), it is hereby ORDERED as follows:

1. The Motion to Strike is DENIED.

2. A bar date of February 26, 1993, is hereby established for all Chapter 11 administrative claimants to file any applications for compensation, including any Applications by the Trustee and any further Applications by his counsel, the law firm of Silberman, Markovitz, and Raslavich ("SMR").

3. In filing any additional applications for compensation, and with respect to SMR's application already granted on June 24, 1992, the Trustee and SMR shall specifically note all services which they contend directly benefitted BOA and its predecessor and/or to which BOA and its predecessor allegedly gave express consent to be performed, and the reasons therefor, within the guidelines set forth in this Opinion, and shall set forth Statements of the amounts claimed payable to them by BOA and Briefs in support thereof, on or before February 26, 1993.

4. BOA or any other interested party is provided an opportunity to respond to the submissions made pursuant to paragraph 3 of the Order, by Briefs or otherwise, on or before March 12, 1993.

5. The original copies of the materials set forth above shall be filed with the Clerk of this Court and copies sent to opposing counsel and delivered to the Court on or before 4:30 P.M. on the respective dates indicated at the following address:

The Honorable David A. Scholl
United States Bankruptcy Judge
3722 United States Court House
601 Market Street
Philadelphia, PA 19106–1763